EFFIE SHAW, Administratrix of Estate of JOHN D.
SHAW, v. CHICAGO & ALTON RAILROAD COM-
PANY, Appellant.

Division One, April 12, 1926.

1. **VENUE: Employers Liability Act.** The Federal Employers' Lia-
bility Act is, by act of Congress, a part of the law of every state,
and causes of action arising under it are enforceable in the courts
of Missouri; and a motion to dismiss, on the ground that both
plaintiff and defendant are residents of another state, that the
cause of action arose in such other state, that its trial in the courts
of this State means the bringing of witnesses from a great distance,
and is an imposition on the taxpayers of this State and upon de-
fendant, should be overruled.

2. **ACTIONABLE NEGLIGENCE: Stepping upon Footboard: Unchal-
lenged Petition: Sufficiency of Evidence.** The petition charged that
as a switch engine was being backed over switch tracks to con-
nect with and switch interstate cars, the yard-master "stepped upon
the foot-board of said moving engine at a point near where it was
the duty of the deceased switchman to board said engine and re-
mained standing in that position, requiring deceased to step upon
the track on which said engine was being operated to board same,
and when said deceased was in the act of boarding said engine and
stepping from the roadbed to the foot-board said yard-master sud-
denly stepped to that part of the foot-board where deceased was at-
tempting to get on, striking his body against that of deceased, caus-
ing the latter to fall back on the ground," etc.; that said yard-mas-
ter "failed to warn deceased of his intention to change his position
on said foot-board," and "knew, or in the exercise of ordinary care
could have known, at the time he stepped and remained upon the
end of the foot-board that it was the duty of deceased to board
said engine, and that deceased was upon the track and in a posi-
tion to step upon the foot-board," etc. No demurrer was filed to the
petition, nor is its sufficiency to charge actionable negligence chal-
lenged in this court. *Held*, that the petition stated a cause of action
under the Federal Employers' Liability Act, making every common
carrier by railroad liable in damages for injury or death "resulting
in whole or in part from the negligence of any of the officers,
agents, or employees of such carrier"; and the plaintiff's evidence
tending to prove every negligent act alleged, actionable negligence

was established against defendant, and its assignment that the trial court erred in refusing its peremptory instruction to find for it cannot be allowed, the conflict in the evidence being for the jury to settle.

3. ———: ———: **Sudden Movement.** Where the ordinary practice in the switch-yards was for the first man boarding the foot-board of the switch engine to move immediately to the draw-bar, so as to leave the outer end for the use of the next switchman, and the yardmaster did not do this, but, riding on the back end of the foot-board of the backing engine, with his back to the engine tender, he saw or could have seen the switchman standing between the rails ready to get on the foot-board near the draw-bar and in the very act of getting on, his act in suddenly changing to the place where he ought to have been from the time he mounted the foot-board, and in striking the switchman in doing so, causing him to fall under the engine, was negligence, for which the company was liable, whether he was acting as vice-principal or as a mere employee.

4. ———: **Posthumous Child.** In the action under the Federal Employers' Liability Act, brought by plaintiff as administratrix of her deceased husband, a switchman killed in interstate commerce, for herself and her infant child, the court did not err in admitting evidence to the effect that said child was born six days after the husband's death, or in holding that the child was a proper beneficiary for whom she could recover damages.

5. ———: **Assumption of Risk.** A switchman, in getting on the foot-board of a switch engine from between tracks, did not assume the risk, where his injuries were due to the sudden and negligent change of position by another employee on the foot-board, of which sudden movement the switchman had no knowledge or means of knowing. The doctrine of assumption of risk has no application when the negligence of a fellow-servant, which the injured party could not have foreseen or expected, is the sole, direct and immediate cause of the injury.

6. ———: **Witness: Impeachment: False Statements: Fear of Discharge: Contradiction of Explanation.** A railroad employee, who had seen the accident, had made (a) a report to the defendant railroad company, written and signed by him; (b) another statement prepared for him was signed by him, and he testified that he did not know all that was in it because he had not prepared it; and (c) admitted his testimony at the coroner's inquest, but explained that he had a job and wished to hold it. The effect was that the two statements and his testimony before the coroner had been shaded in favor of the defendant because he feared he might be discharged.

He was a member of a union, and defendant offered to show that, under the rules of the union and by agreed consent of defendant, if discharged without reasonable cause, he could take his case to several committees and boards for final determination. *Held*, that the offer was properly excluded, since it was the bringing in of a collateral issue; and especially so where the witness had testified that he did not know what he could do if he had been discharged.

7. ———: Assumption of Risk: Instruction. Assumption of risk is an affirmative defense, and must be properly pleaded and shown, and is not a constituent element of plaintiff's case, and therefore need not be included in plaintiff's instruction.

8. ———: Excessive Verdict: Twenty-Five Thousand Dollars. Deceased was twenty-two years of age, and his wife nineteen. A child born six days after the accident is shown to be healthy. He was earning from $150 to $175 per month, and turned over his earnings to his wife, and they were living in their own home. He. was strong and healthy, and at his age his prospects for advancement and higher wages were better than those of older like employees. His death was not instantaneous, and hence pain and suffering enter into the case as an additional element of damages. *Held*, that a verdict for $25,000, as damages to his wife and the infant child, is not excessive, under the Federal Employers' Liability Act.

Corpus Juris-Cyc. References: Death, 17 C. J., Section 62, p. 1216, n. 52; Section 114, p. 1262, n. 59; Section 235, p. 1350, n. 7. Master and Servant, 39 C. J., Section 797, p. 674, n. 19; p. 675, n. 21; Section 1168, p. 933, n. 43; Section 1320, p. 1126, n. 5; Section 1419, p. 1242, n. 37. Witnesses, 40 Cyc., p. 2758, n. 38.

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield*, Judge.

Affirmed.

*Roger S. Miller* and *Charles M. Miller* for appellant.

(1)    Respondent, as administratrix, appointed under the laws of the State of Illinois, has no right or authority to maintain this suit in Missouri, and the trial court erred in not sustaining the motion to dismiss. McGinnis v. Mo. Car & Foundry Co., 174 Mo. 225; Lee v. Mo. Pac. Ry. Co., 195 Mo. 400; Miller v. Hoover, 121 Mo. App. 568; Sec. 1163, R. S. 1919; Davis v. Farmer's Co-Operative Equity Co., 262 U. S. 312.    (2)    No actionable negli-

gence was proven against appellant and the trial court erred in refusing appellant's peremptory instructions. Reeves v. Railroad, 251 Mo. 169; Stumff v. Corn Products Co., 155 Ill. App. 194; Rollison v. Railroad, 252 Mo. 541; Sullivan v. Giddeon & N. I. R. Co., 271 S. W. 990. (3) Deceased assumed the risk of being injured in attempting to mount the foot-board, located on the end of the tender by stepping between the rails to do so, while the engine and tender were backing up toward him, when he could have mounted the foot-board from outside the rails and avoided the danger of mounting the foot-board from between the rails, and the trial court erred in not declaring he assumed the risk, barring recovery, and in not giving the peremptory instructions requested by appellant. Pryor v. Williams, 254 U. S. 43; Berkshire v. Southern Pac. Railroad, 254 U. S. 415, 65 Law Ed. 335; Horton v. Railroad, 233 U. S. 492; Boldt v. Railroad, 245 U. S. 441; Morris v. Duluth, 108 Fed. 747; Suttle v. Railroad, 144 Fed. 668; Jacobs v. Railroad, 241 U. S. 229; Wise Terminal Co. v. McCormick, 104 Va. 51; Pratt v. Southern Railroad, 165 Ala. 501; Givens v. Railroad, 66 Iowa, 231; Dandie v. Southern Railroad, 42 La. Ann. 686. (4) The trial court erred in admitting in evidence that six days after the accident, Mrs. Shaw gave birth to a child, and in holding that the child was a proper beneficiary for which damages could be recovered. Buel v. Railroad, 248 Mo. 126; Strode v. Transit Co., 197 Mo. 616. (5) The trial court erred in refusing appellant's offer of proof, relating to conditions and circumstances, under which an employee may be discharged, which was offered by appellant for the purpose of contradicting, impeaching, and discrediting the testimony of respondent's witness Smock, to the effect that he gave untrue testimony before the coroner's inquest, under oath, and other untrue written statements to appellant, because he was afraid he would be discharged, if he did not do so. (6) The verdict and judgment is not only excessive, but so excessive as to indicate passion and prejudice on the part of the jury, against appellant. Midwest Nat.

Bank & Trust Co. v. Davis, 288 Mo. 563; Burtch v. Wabash Ry. Co., 263 S. W. 338.

*J. Vernet Jones, Harry R. Freeman* and *Madden & Madden* for respondent.

GRAVES, J.—Action for death of the husband, occasioned by the alleged negligence of the defendant.

It is not seriously contended that deceased, at the time of his accident and death, was not engaged in interstate commerce. The action is brought under the Federal Employers' Liability Act. The deceased and his family lived at Roodhouse, Green County, Illinois. Deceased was a switchman employed in defendant's yards at Roodhouse. Plaintiff, the wife of the deceased, was appointed administratrix of his estate by the proper court in Greene County, Illinois. One line of defendant's road was operated from Roodhouse, in Greene County, Illinois, across Missouri, and into Jackson County, Missouri, in which latter county this suit was brought. The plaintiff sues as administratrix for and in behalf of herself, and a minor son, who was born a few days after Shaw met his death. The negligence is thus stated in the petition:

"Plaintiff further states that on or about the 24th day of May, 1920, John D. Shaw, deceased, was in the employ and service of defendant as a switchman at said yards in Roodhouse, Greene County, Illinois, and was engaged with other employees of defendant in switching cars in and about said yards; that said cars and their contents were shipped and moved from points outside the State of Illinois and were *en route* to points in the State of Illinois and other states, and that in handling said cars the defendant and John D. Shaw, deceased, were engaged in commerce between states.

"At the above-mentioned time a switch engine was being backed over one of said switching tracks to connect with and switch interstate cars and shipments as aforesaid, and one Whitmore, acting as yard-master and fore-

man and vice-principal over the plaintiff, stepped upon the foot-board of said moving engine at a point near where it was the duty of deceased to board said engine and remained standing in that position, requiring deceased to step upon the track on which said engine was being operated to board same, and when said deceased was in the act of boarding said engine and stepping from the roadbed to the foot-board of said engine said Whitmore suddenly stepped to that part of the foot-board where deceased was attempting to get on, striking his body against that of deceased, causing the latter to fall back to the ground and be run over by said switch engine, cutting off both his legs and injuring him internally, and as a direct result of said injuries he died several hours later on said date.

"Said John D. Shaw was a strong and healthy man twenty-two years of age at the time of his death and left surviving him Effie Shaw, his widow, age eighteen years, and a few days after his death a son, John David Shaw, was born. Said Effie Shaw was entirely dependent upon deceased for her support and maintenance, and this action is brought for the benefit of said widow and child who had a pecuniary interest in the life of deceased and by said interest suffered and will suffer in the future the pecuniary loss of the society, consortium, maintenance, support, assistance and contributions of said John D. Shaw, deceased, and said child will also suffer the pecuniary loss of his father's care, advice, counsel and training.

"The injuries and death of said John D. Shaw, deceased, were due to and occasioned by the negligence of defendant in that said Whitmore was negligent in that after boarding said engine he remained standing at the end of the foot-board where it was the duty of deceased to board the engine, and required deceased to step upon the tracks to board said engine, and said defendant was further negligent in that said Whitmore suddenly and without warning stepped towards the opposite end of said foot-board and against the deceased and prevented

him getting upon said foot-board when he was in the act of boarding said engine, causing deceased to fall and to be injured as aforesaid, and was further negligent in that he failed to warn deceased of his intention to change his position on said foot-board. Said Whitmore knew, or in the exercise of ordinary care could have known, at the time he stepped and remained upon the end of the foot-board that it was the duty of John D. Shaw to board said engine, and that John D. Shaw was in a position to board same, and thereafter he also knew or by the exercise of ordinary care could have known, that John D. Shaw was upon the track and in position to step upon the foot-board prior to the time said Whitmore changed his position upon said foot-board."

The action was for $75,000. Upon a former trial plaintiff had a verdict for $35,000, but this verdict was set aside for reasons not pertinent here.

The defendant first filed a motion to dismiss the proceedings, the particulars of which will be discussed in the opinion. It suffices to say that the motion was overruled, and defendant answered over.

The answer is: (1) plea of contributory negligence, (2) assumption of risk, and (3) a renewal in the answer of the grounds upon which the motion to dismiss was predicated, and a prayer asking a dismissal of the proceeding, with other legal relief. Reply was general denial.

Upon the second trial, from the judgment therein this appeal was taken, the verdict and judgment was for plaintiff in the sum of $25,000.

There is no separate assignment of errors in the brief. Assignments of errors and points and authorities are joined in one. As to this it must be said that the points made assign in specific terms alleged trial errors. These assignments will be left to the opinion. What we have stated is a general outline of the case.

I. The motion to dismiss, which was repeated by way of answer, urges that both plaintiff and defendant

314 Mo.—9.

are residents of Illinois; that the cause of action arose in Illinois; that to try the cause in Missouri meant the bringing of witnesses from a great distance; that the trial of such causes originating as this is an imposition upon our courts, and imposition upon the taxpayers of Jackson County, the place of trial; that such a trial would require the taking of depositions and the inconvenience and expense of getting witnesses, all to the great prejudice of the defendant. This point is fully covered by our very recent case of Wells v. Davis, 303 Mo. 388. The discussion there is so full and so recent that we will not rehash the subject, except to emphasize the fact that where a cause of action is given by the Federal Government, and made enforceable in the state courts, as are cases under the Employers' Liability Act, such a law is not one of a foreign country, but is one which fairly comes within the terms of Section 1163, Revised Statutes 1919, relative to our practice in this State. It is a part of the law in every State. [See also State ex rel. v. Hoffman, 274 S. W. 362.] The motion to dismiss was properly overruled, and that portion of the answer properly ignored by the trial court.

II. The second assignment of negligence goes to the vitals of the case. The plaintiff had evidence tending to prove the issues of alleged negligence pleaded. No demurrer was lodged against this petition. Notwithstanding this situation, the appellant urges as a second assignment of error, that: "No actionable negligence was proven against appellant and the trial court erred in refusing appellant's peremptory instructions, for the reason that no actionable negligence was proven against appellant."

Actionable Negligence.

As stated above there was evidence tending to prove the negligence charged in the petition, and we find nowhere a challenge to the sufficiency of the petition to state actionable negligence. The sufficiency of the petition to charge actionable negligence is not even attacked in this

court.  The portions of the petition which are pertinent we have fully set out in our statement.

As in all cases of this kind, the evidence for plaintiff and defendant is conflicting.  There is some conflict in this case, but it was for the jury to reconcile such conflict, and determine the facts.  This the jury has done. For the determination of this particular point it will only be necessary for us to give the facts shown by plaintiff, and then determine whether or not they show actionable negligence.

The husband (deceased) of plaintiff was a switchman in the switch-yards of defendant at Roodhouse, Illinois. The switch crew to which John D. Shaw (deceased) belonged, and with which he was working, was composed of Charles R. Smock, as foreman of the crew; E. O. Vineyard, engineer; William Cardwell, fireman of the engine; John D. Shaw and Frank England.  Joe Whitworth was the assistant yard-master, and gave the orders to Smock for the switching to be done that night.  The crew went on duty at midnight, and Shaw was run over and killed twenty minutes later.  Whitworth had charge of business in the north yard more particularly.  There were three adjoining yards at Roodhouse, all having a general direction of from south to north.  The stock-yards were to the northwest.  A train of dead freight had come in from Missouri (west of Roodhouse), and this switch crew was to take out and add to cars from this train, in making up a new train to go north and east from Roodhouse.  They also had to take off the caboose and put it upon the caboose track, and get another caboose for the train that they were making up.  This switching crew went to the round-house to get a switch engine for their work, and when they got it they started northward toward the north switch-yard, where Whitworth's office was located.  Whitworth went with them.  There were several switches to be opened as they proceeded northward, and Whitworth assisted in this work and in fact opened two switches. This was shown to have been customary in such yards.  Whitworth was working his way up

toward his office, and working with this particular switch crew, and riding on their engine. The engine was backing up north, and Whitworth was riding upon the back end of the engine, or the end facing the north. As to exactly what happened the foreman, Smock, had better speak:

"Q. Now, just tell what operations you went through after you started out. What did you do when you got up to the cross-over leading from the main line to Long 9 track? A. We stopped at the cross-over switch, and Mr. Whitworth he got off and threw that, and Mr. English got off to turn it back, and we backed up to the other cross-over switch, about fifteen feet from there, and stopped, and Mr. Whitworth got off and threw it first, and Mr. Shaw got off and went around Mr. Whitworth to throw the second switch for Long 9. Both switches were long. Then Mr. Whitworth walked back to the engine and got on the step on the east side, and I gave the engineer a back-up signal, and we backed up to where Mr. Shaw stood, and Mr. Whitworth still standing on the east side at the outside of the foot-board and Mr. Shaw seen he wasn't going to get over—

"MR. MILLER (interrupting): I object to that.

"THE COURT: Objection sustained.

"MR. MADDEN: You can't tell what Mr. Shaw saw.

"MR. MILLER: I move to strike it out.

"THE COURT: Motion sustained.

"Q. Tell what Mr. Whitworth did and what Mr. Shaw did. A. Mr. Whitworth stood on the outside, and Mr. Shaw stepped over on the inside when the engine got about six feet from him, and stepped to get on, and about this time he started to get over, Mr. Whitworth stepped in front of him, and that hit his foot and his foot slipped and went in under.

"Q. Who went in under? A. Mr. Shaw.

"Q. Under what? A. The tank of the engine."

Where Whitworth placed himself would be the usual place for the switchman to board the foot-board of the engine, and ride. The custom was for the first one on

the board to move to the draw-bar. These engines are equipped with two foot-boards, one upon either side of the draw-bar of the engine. Deceased was to the east side of the engine, when Whitworth took his position. Whitworth got on when the engine was standing, and upon Smock's signal it started up and was going two to three miles per hour when deceased stepped over between the tracks to board it. To so board an engine was usual in these yards. Witness Smock further says:

"Q. Now, so the jury will understand, your engine ran along here, north from the main line until you got to the first cross-over, did it not? A. Yes, sir.

"Q. Who was it threw the switch? A. Mr. Whitworth.

"Q. Mr. Whitworth himself threw that? A. Yes, sir.

"Q. Then after that was thrown, what did your engine do? A. Mr. England got off and we backed up on to this cross-over.

"Q. You say you backed the engine? A. Yes, sir.

"Q. But you went over from the main line on that cross-over until you approached the second stand, did you not? A. Yes, sir.

"Q. Was that switch thrown? A. Yes, sir, Mr. Whitworth threw that.

"Q. Mr. Whitworth threw that, too? A. Yes, sir.

"Q. What did Mr. Shaw do at the time Mr. Whitworth was throwing that switch? A. He went around to throw this switch (indicating).

"Q. That is the third switch stand, is that right? A. Yes, sir.

"Q. And after Mr. Whitworth threw the second switch, what did he do? A. He came back then where the engine was and got on. ·

"Q. Your engine was standing between the two tracks? A. Yes, sir.

"Q. Between the main line and the track called Long 9 and Short 9, is that right? A. Yes, sir.

"Q. Then he got on the foot-board, did he? A. Yes, sir.

"Q. Then what did the engine do? A. Backed up.

"Q. Backed up onto Long 9? A. Yes, sir.

"Q. And had Mr. Shaw thrown the switch? A. He had thrown the switch; the third switch. Shaw had thrown the switch; the third switch. Shaw had thrown the switch and was standing there to get on the engine.

"Q. Standing there to get on; you saw that, did you? A. Yes, sir.

"Q. And when the engine was nearing this stand was he standing there near the third stand? A. We went down about six feet of him and he stepped over between the track.

"Q. That is, between the rails? A. Yes, sir.

"Q. That is about the place where the accident happened? A. Yes, sir."

The steps of which we spoke were about eight inches above the rails, or about twelve inches above the ground. Smock further testified:

"Q. And those steps were on the engine there for what purpose? A. For switchmen to get on and off.

"Q. And to ride on? A. Yes, sir.

"Q. Where was Mr. Whitworth's office? Which direction from the way you were going? A. Well, his regular office was at the south end of the north yard. It is a little north from where we were there.

"Q. That is, he would be going up towards his office while he was riding on the step? A. Yes, sir, that is what he is figuring on.

"Q. And did he have anything to do with the switching movement? A. No, sir.

"Q. Directing them or taking part in them? A. No, sir,

"Q. Was that sometimes done, however, by yardmasters? A. Oh, they do it once in a while.

"Q. And he was doing it on this night? A. Yes, sir.

"Q. How far away from this point was his office? What distance? A. From where the accident occurred?

"Q. Yes. A. Oh, maybe one hundred yards.

"Q. Had he prior to this time gotten up on the foot-board, as on this occasion and get off at his office? A. Yes, sir.

"Q. How long had Mr. Whitworth been in the service of the company as assistant yard-master? A. Well, I think he had been assistant yard-master about a month.

"Q. What had he been prior to that time? A. Foreman of engines.

"Q. Was he over you in your duties? A. Yes, sir.

"Q. Who was it gave the signal for the movement of the engine? A. I did."

After detailing facts tending to show that the place of accident was well lighted by the electric head-light of the engine and the lanterns of the crew, this witness, Smock, further testified:

"Q. Tell the jury how Mr. Whitworth was standing on the step there from the time he got on up to the time he stepped over in front of Mr. Shaw. Which way was he facing? A. He was facing the north, like it would be when standing on the east side on the foot-board.

"Q. Do you remember how he was holding his lantern? A. On his right side.

"Q. Was that in view of Mr. Shaw? A. Yes, sir.

"Q. When he stepped over there did he give Mr. Shaw any warning of any kind? A. No, sir.

"Q. When he did step over how far did he step? A. Well, about a foot and a half.

"Q. And where did he step with reference to being in front of Mr. Shaw? A. Right in front of him."

The foregoing are facts which the jury could find, if they believed the witness Smock, as they evidently did. Deceased was taken to a hospital, and died early the same morning. The law, upon the facts, and other pertinent facts are left for the next paragraph.

III. A short *resume* of the foregoing facts, and other facts is not inapropos before discussing the liability or non-liability of defendant under the facts shown. (1) Whitworth was serving in a dual capacity at the time of the accident; i. e. he, as a vice-principal, gave the orders for the work, and in addition was actually participating therein as switchman. (2) His service in such dual capacity was shown to be customary in these yards. (3) It was the rule for the first man on the switch-board to move to the center, or to the draw-bar, and leave the outside end of the board open for the next man to use in getting upon the board, and this Whitworth did not do. (4) The jury could well find that Whitworth was facing north, with his back to the engine tender, and saw or could have seen deceased, and his every act. (5) The evidence further tends to show that it was usual and customary for switchmen to stand between the rails when getting upon the switch board. (6) That with deceased standing between the rails, and ready to get on the board near the draw-bar, and in the very act of getting on, Whitworth, with deceased in his plain view, suddenly changed to the place, where he ought to have been from the first, and in so doing struck deceased and caused him to fall under the engine. We say deceased was in plain view of Whitworth all the time, because the jury could have well found that he was facing deceased, in a well-lighted place, from the time Whitworth boarded the engine to the time that deceased was prevented from getting on the board by the sudden action of Whitworth in changing positions.

The Federal statute is important in determining liability under the facts of this case. The applicable portion, deleting the unnecessary clauses, read: "That every common carrier by railroad while engaging in commerce between any of the several states . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in the case of the death of such employee, to his or her personal representative, for the benefit of the surviving

widow or husband, and children of such employee; . . . for such injury or death *resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.*"   Note the use of the word "officers, agents, or employees."   [35 U. S. Statutes at Large, p. 65.]   So while Whitworth at the time of the accident was both a vice-principal and an employee, as measured by the services he was rendering at the time of the accident, yet this is not really material under the statute.   The negligence of an officer makes the company liable, as well as the negligence of a mere employee. The statute is broad and covers the negligent acts of all from the president of the corporation down to the mere employee.   The statute speaks for itself, and we need not waste words in further discussing it.   Nor need we go extensively into the cases cited *pro* and *con*.   Whitworth was negligent,   (1)   in not moving over toward and to the draw-bar when he first got upon the running board, and (2) in suddenly changing his position, when he saw or could have seen deceased attempting to board the engine from the space in the middle of the track, before said Whitworth changed his position.   He knew deceased had thrown a switch and was waiting the approach of the engine to board the running board.   From plaintiff's evidence he was faced toward the plaintiff at a well lighted place, and could have observed his every movement.   His failure to look, or looking his failure to properly act, was negligence which snuffed out the life of John Shaw.   Under the statute, supra, the defendant is liable for such negligence.   That the facts charged in the petition and shown by plaintiff's witnesses, did not constitute actionable negligence, is clearly an afterthought, because it could have been all threshed out upon a demurrer to the petition, but none was filed.   The failure to file a demurrer to the petition cannot be charged as neglect or misjudgment of learned counsel for the defendant, because the petition did state a cause of action, and the proof tended to sustain all the charges in the petition.

The ordinary practice was for the first man boarding the foot-board to move immediately to the drawbar, so as to leave the outer end for the next man to use. This Whitworth did not do, but on the other hand waited until deceased undertook to take the inner space, and then suddenly moved over so as to knock deceased under the wheels. Deceased had his foot up to step upon the board, and his hand out to grab the handhold, when Whitworth suddenly stepped over and struck Shaw, throwing him under the engine.

Further the testimony tends to show that it was usual and customary to get on the foot-board from the middle of the tracks. But this is not really material in this case, because the real cause of the injury was the sudden shifting of position by Whitworth. The evidence of the plaintiff made a case for the jury on the question of liability and actionable negligence, and we cannot disturb their finding, absent procedural error of some kind.

IV. In the original assignment of errors, it was stated: "The trial court erred in admitting in evidence, that six days after the accident, Mrs. Shaw gave birth to a child, and in holding that the child was a proper beneficiary for which damages could be recovered."

Posthumous Child.

In the reply brief learned counsel admits that he had not seen the opinion in the recent case of Bonnarens v. Lead Belt Ry. Co., 309 Mo. 65, 273 S. W. 1043, l. c. 1046, the effect of which is to deny this contention of the appellant. The Bonnarens case, supra, was well ruled by Division Two of this court, and we concur therein. This assignment must therefore be overruled. But, as said, the reply brief of appellant does not combat the soundness of the doctrine announced in the Bonnarens case, and in effect abandons the contention.

V. A further contention is that the plea of assumption of risk was good, and therefore a recovery

should be denied.   This contention proceeds on the theory that because deceased was getting on the foot-board from between the tracks, he assumed such risk. We shall not go into the cases upon the Federal doctrine of assumption of risk, and that state courts must apply that doctrine in determining the question in these Federal Employers' Liability cases. The Federal rule has never gone further than to apply the strict old common-law rule of assumption of risks.   That is to say, the servant assumes the usual risks incident to the work in which he is engaged, and further that he assumes the risk of conditions of ,which he has knowledge, or acquires knowledge in the course of his employment.   We can give the Federal case law upon the subject the most extreme exposition to which some cases go, and yet it will not affect this case.   The death of Shaw was occasioned by the negligent act of Whitworth, and not by the fact that he was within the two rails of the track.   Nor need we discuss the fact that the proven custom of that yard was for brakemen to get upon this step while standing between the two rails upon which the engine was approaching.   Shaw did not assume the negligent act of Whitworth, of which he had no knowledge, or means of knowledge, until the fatal and negligent act was done, and Shaw under the wheels of the engine.   The plea of assumption of risks must fail.

*Assumption of Risk.*

In Reed v. Director General of Railroads, 258 U. S. 92, the U. S. Supreme Court has well said: "In actions under the Federal act, the doctrine of assumption of risk certainly has no application when the negligence of a fellow-servant, which the injured party could not have foreseen or expected, is the sole, direct, and immediate cause of the injury.   To hold otherwise would conflict with the declaration of Congress that every common carrier by railroad, while engaging in interstate commerce, shall be liable to the personal representative of any employee killed while employed therein, when death re-

sults from the negligence of any of the officers, agents, or employees of such carriers.''

This is but the common sense of the thing. This contention of appellant is therefore overruled.

VI.   G. R. Smock, foreman of the switch crew, had made two written statements, and had testified at the coroner's inquest.   The first written statement did not especially harm plaintiff's case, or especially contradict the statements he made on the stand as a witness for the plaintiff. This statement Smock made out himself, signed it, and sent it in to the proper officials.   Apparently not satisfied with this statement another was made out for him to sign, and he did so.   On the stand Smock admitted the signing of the two statements, but explained that he did not know all that was in the second one, because he had not prepared it.   The two statements were introduced in evidence to contradict and impeach the witness upon the stand. · He admitted his testimony before the coroner also, but explained that he had a job and wanted to hold it.   The effect of it all was that his statements and evidence had been shaded in favor of the defendant, because he feared he might be discharged. As to which  time he was giving the facts was a pure question for the jury.

Witness: Impeachment: Fear of Discharge.

Smock, however, was a member of a union, and defendant sought to show that under the rules of the union and by consent of the defendant, in an agreement, an employee if discharged without reasonable cause could take his case to several committees and boards for final determination.   The offer of evidence which was rejected by the trial court, is as follows:

''MR. MILLER:  I expect I had better make my offer of proof on that, in view of what was said.  I offer to prove by this witness that in the discharge of an employee he is only discharged for just cause, and then a full hearing is had before a committee of the union to which he belongs and representatives of the railroad,

to determine whether or not there was just cause for the discharge of the employee, and then if the employee is dissatisfied with the result of this conference and meeting of the representatives of his organization and officers of the railroad, it may by either party be taken to the railroad wage-board for a final determination.''

Learned counsel for defendant had previously stated the object of such proof thus:

''Q. Are you a member of the Switchmen's Union? A. No, sir, I am a member of the Brotherhood of Railway Trainmen.

''Q. Now, when a man is discharged, what method is there for a review of it?

''MR. MADDEN: I object to that testimony as being entirely immaterial. What the relation of the union is with the railroad with reference to this matter, is immaterial.

''THE COURT: I think so.

''MR. MILLER: A man here says he is afraid he will be discharged, and I want to show no man is discharged except on full hearing and for having cause, and if a man desires he can appeal it, under the law, to the railroad wage-board.

''THE COURT: I don't think that is material.

''MR. MILLER: I only offer this in view of the statement of Mr. Smock that he was afraid he would lose his job, and I want to show by that that it wasn't within the power of the company to discharge any man, except on a hearing and for just cause.

''THE COURT: I don't think we will go into that. Objection sustained.''

In our judgment the trial court was right. Smock had said that he did not know what he could do if he had been discharged, and had given his reason for his statements and evidence before the coroner's jury. This evidence was bringing into the case an irrelevant issue, if it could be called an issue. It could hardly be called an issue, because Smock was not advised of his remedies, should there be a discharge. At least he so testifies.

There would have to be a discharge, before Smock could go to any tribunal for redress, and he was not advised as to his remedy, as he says. The evidence is so far foreign to any method of impeaching a witness that we are constrained to rule as did the trial court. [40 Cyc. 2563 and 2570; Beemer v. Kerr, 23 U. C. Q. B. 557; Dufresne v. Weise, 46 Wis. l. c. 298; State v. Goodbier, 19 So. 755-6.; 2 Wigmore on Evidence, sec. 1046.]

This offer of evidence was to disprove the witness's explanation of the discrepancies between his testimony on the stand, and his previous statements. It is therefore a purely collateral issue.

In Beemer v. Kerr, 23 U. C. Q. B. l. c. 559, DRAPER, C. J., said: "If he offers explanations why his statements conflict, they are neither relevant to the issue tried, nor do they alter the fact that he has contradicted himself on oath, and any evidence as to the truth of his explanations, and not as to the fact in issue, to which his evidence relates, must be collateral, and ought not to be received."

So too in Dufresne v. Weise, 46 Wis. l. c. 298, ORTON, J., said: "We understand that rule to be, to first call the attention of the witness sought to be contradicted by his statements elsewhere, to such statements, and the time, place and occasion; then, if denied or ignored to prove such statements by other witnesses; and finally, to allow the first witness to reaffirm or explain his evidence; *and this is the end of the inquiry.* [1 Greenl. on Ev. sec. 462.]" The italics above have been added by us.

Further in the case of State v. Goodbier, 19 So. l. c. 756, the Supreme Court of Louisiana said: "The right of the party to offer proof of contradictory statements of a witness is restricted, and ceases altogether when the contradictions are admitted. Testimony to show that the explanation, given by the witness of the admitted statements, is false, it seems to us, is inadmissible, as held by the lower court."

These cases seem to announce the general and sound rule. Cases cited by appellant are in no way in point.

The offer of proof was one covering a purely collateral matter, and the trial court properly rejected it.

VII.   There is some criticism of instruction five on the measure of damages, but it is without substance. This leaves only the alleged excessiveness of the ver-

Assumption
of Risk.

dict.   There is (which we were about to overlook) a charge that instruction two was error, because it did not mention therein the defense of assumption of risk.   Assumption of risk is an affirmative defense, and must be properly pleaded and shown, and is not a constituent element of plaintiff's case, and therefore need not be included in plaintiff's instruction.   Such is the effect of the ruling in State ex. rel. Ambrose v. Trimble, 304 Mo. 533, 263 S. W. 840. This ruling was by Court in Banc, and governs this division of the court.

As to the damages it must be considered that Shaw was a younger man than was Gill in the case of Gill v.

Excessive
Verdict.

Railroad Co., 302 Mo. 1. c. 331.   He was not only younger, but equally as strong and healthy.   His wife was much younger than Mrs. Gill.   In addition there is an infant child, shown to be healthy.   The Gill case   was one in Court in Banc, and the writer was the only one to dissent.   While the earnings of Gill were slightly in excess of the deceased Shaw, but Shaw was two years younger, and his prospects for advancement and higher wages that much greater.   Mrs. Gill was thirty-two years of age, and plaintiff in this case was nineteen and strong and healthy.   In this case deceased was making from $150 to $175 per month, and turned over his earnings to his wife, and they were living in their own home.

In Kidd v. Chicago, R. I. & P. Ry. Co., 310 Mo. 1, the deceased was thirty-five years of age and earning $184 per month.   He left a wife and three or four children.   We permitted the verdict to stand for $25,000, and approved the Gill case, where the verdict was for $22,333.33.   Thus the rule for the measure of damages in

the Gill case has the sanction of Court in Banc, and of this Division in the Kidd case. Under these cases, which the writer is now obligated to follow, the verdict in this case is not excessive.

In this case death was not instantaneous, and hence an additional element of damages, not involved in cases where death is instantaneous, and hence no pain and suffering upon the part of the deceased. The judgment is affirmed. All concur.