GEORGE BUSCH v. LOUISVILLE & NASHVILLE RAILROAD COMPANY, Appellant.—17 S. W. (2d) 337.

Division One, March 29, 1929.

470

*A. M. Warren* and *H. R. Small* for appellant.

*Charles P. Noell* and *Abbott, Fauntleroy, Cullen & Edwards* for respondent; *Glen Mohler* of counsel.

474

RAGLAND, J.—This case comes to the writer on reassignment. The action is for personal injuries alleged to have been suffered by plaintiff while employed in interstate commerce, through the negligence of the defendant, his employer. As a number of the questions urged here relate to the sufficiency of the evidence to support the several assignments of negligence relied on by plaintiff, the facts will be stated from the standpoint of his evidence. Conflicting evidence on the part of the defendant, where material, will be noted.

On July 12, 1924, plaintiff was in the employ of defendant as fireman: on that day he was firing an engine which was pulling a local freight train from Mt. Vernon to East St. Louis, in the State of Illinois. When the train reached Belleville, it took a siding to await the passing of a fast freight known as No. 79. Defendant's main track and its passing track at that point run approximately east and west: the passing track is north of the main track, parallels it and is just a sufficient distance from it to enable cars moving on one of the tracks to clear cars on the other. The local freight was going west: No. 79 was coming east. The local entered the passing track at a switch just east of the depot at Belleville. When it came to a stop the crossing of a north-and-south street just west of the station was obstructed; the train was cut at that point and the front moved up so as to clear the crossing; the engine then came to a stop on the crossing of the street next west; it was then uncoupled from the train and moved a short distance west clearing the crossing. With the train in that condition and so standing, the crew

awaited the coming of No. 79. It was then about 5:30 P. M.; the day was intensely hot; the crew had been on the road ten hours. Plaintiff climbed down from the cab, walked east and sat down on the north rail of the passing track, on which the engine was standing—from fifteen to eighteen feet from the rear of the tender, but in the shade made by it. There were no other structures in the immediate vicinity which afforded a shade, and there were no trees. As plaintiff sat he faced the south: his feet were between the rails. At the same time that plaintiff left the cab, the engineer, Schmidt, climbed down and proceeded to make an inspection of his engine and oil it. The head brakeman, Porter, also got down and walked back to confer with the rear brakeman with reference to the work of setting out some cars after No. 79 had passed. Presently Porter came back to where plaintiff was sitting and they engaged in conversation: at this juncture the engineer came around the tender, oil can in hand, paused an instant, and then passed on for the purpose apparently of oiling bearings on the other side of the engine. Shortly thereafter No. 79 was heard coming: Porter walked away, but plaintiff continued to sit on the rail; as the engine of No. 79 passed he waved to the fireman. In the meantime the engineer had gotten back into the cab; Porter, from somewhere along the side or in front of the engine, gave him a signal to back for the purpose of coupling up; the engine was at once started moving backward—before all of train No. 79 had passed. Plaintiff received no notice or warning, by bell or otherwise, of the intended movement of the engine. The bell was not rung before it moved. Plaintiff was subsequently pulled out from under the engine.

A rule of the defendant provided: "The engine bell must be rung when the engine is about to move." And there was a long-established practice and custom, well known to defendant and to its employees, not to move an engine, under the circumstances existing at the time in question, until after (1) the bell had been rung and (2) the fireman had taken his position in the cab. It was a like practice and custom for members of a crew, engineer, fireman and brakeman, under like circumstances, to sit on the rail of the track, while waiting to move. if no more convenient place was available.

There was countervailing evidence on the part of the defendant with respect to the alleged custom not to move an engine until the fireman was in his place; there was also evidence that the bell was rung; and that No. 79 while passing made a great deal of noise. The engineer testified that he did not walk around the tender; that he did not know that plaintiff went back and sat on the rail; and that he in fact did not know that plaintiff had left the cab. Porter testified that he had forgotten that plaintiff was sitting on the rail

just in the rear of the tender when he gave the engineer the signal to back up.

That defendant, in operating the train, was engaged in interstate commerce is not questioned; it is contended that plaintiff, while sitting on the rail, was not employed in such commerce.

The petition predicates negligence as follows: (1) The engineer, knowing, actually or constructively, that plaintiff was sitting on the rail immediately back of the tender, started the engine back without giving him any notice or warning of the intention so to do; (2) the engineer, in violation of the custom and practice, put the engine in motion without first having sounded the engine bell; (3) the engineer, in violation of the custom and practice, started the locomotive engine while plaintiff, the fireman, was off and away from the inside of the cab; and (4) the brakeman, knowing that plaintiff was seated on the rail immediately back of the tender, signaled the engineer to move the engine and tender back toward plaintiff. In the principal instruction given for plaintiff the jury were directed to return a verdict for him if they found the defendant negligent in any of those particulars.

The answer consisted of a plea in abatement, a plea of assumption of risk and a general denial.

The jury, finding for plaintiff, assessed his damages at $81,000: the trial court required the entry of a *remittitur* of $45,000 as the condition upon which the motion for a new trial would be overruled. The *remittitur* was entered and judgment rendered for plaintiff in the sum of $36,000; this appeal on the part of defendant followed in due course.

Other record facts will be noted in connection with the questions considered. The assignments of error will be taken up and passed on in the order in which they are briefed.

I.   In the plea in abatement it was alleged that plaintiff was not, and never had been, a resident of the State of Missouri; that defendant was a Kentucky corporation; that in Missouri it was engaged in interstate commerce only—between St. Louis  and points in Illinois and Indiana and south and southeast thereof; and that all of the witnesses who would be called to testify in the case resided out of Missouri.   Following those allegations the plea concluded thus: ''the requiring of defendant to submit to suit in the city of St. Louis, Missouri, on the cause of action alleged in plaintiff's amended petition, is an undue burdening of interstate commerce and of the regulations of interstate commerce, in violation of Section 8 of Article I of the Constitution of the United States, and defendant states that defendant is denied due process of law as guaranteed to

it under the Fourteenth Amendment of the Constitution of the United States by the practice and holding in Missouri in this case and, in other cases that the return of the sheriff herein is conclusive and that the return in this case is a return that defendant is engaged in business in Missouri.''

The circuit court overruled the plea in abatement and its action in that respect is assigned as error.

Whether the practice and holding in Missouri, that the return of the sheriff to an original writ of summons is conclusive, is a denial of due process of law as guaranteed by the Fourteenth Amendment does not seem to be involved in the case. Defendant admits that it was engaged in interstate commerce within the State, and ''the presence of a corporation within a state necessary to the service of process is shown when it appears that the corporation is there carrying on business in such sense as to manifest its presence within the state, although the business transacted may be entirely interstate in character.'' [International Harvester Co. v. Kentucky, 234 U. S. 589.]

As to the further contention that the prosecution of the suit in a state where neither parties nor witnesses reside is in violation of the commerce clause of the Constitution, we cannot do better than adopt the reasoning of the Court of Appeals of the District of Columbia, in Harris v. American Railway Express Co., 12 Fed. (2d) 487:

''If Congress had deemed it proper to limit and prescribe the venue of such actions for the better regulation of interstate commerce, suitable legislation would have been enacted for that purpose. Such legislation might permit such actions to be brought only in the state or district where the shipment originated, or where it terminated, or where the goods were injured while in transit, or where the claimant resided. Other considerations also might apply. But in the absence of legislation upon the subject it would produce confusion and injustice for the courts to assume authority to prescribe such rules.''

This case is clearly distinguishable from Davis v. Farmers Cooperative Company, 262 U. S. 312. A foreign corporation must submit, if there is jurisdiction, to the requirements of orderly, effective administration of justice, although thereby interstate commerce is incidentally burdened. [Hoffman, J., v. Missouri ex rel. Foraker, 274 U. S. 21.]

II.   Appellant next assigns as error the refusal of the trial court to discharge the jury following misconduct on the part of plaintiff's counsel. The conduct so characterized is portrayed in the following excerpt from the bill of exceptions:

''MR. NOELL: This is not the first time Mr. Schmidt injured people out there at Belleville, is it?

"MR. SMALL: I didn't hear that.

"MR. NOELL: You are familiar with Mr. Schmidt's career in the last few years in accidents similar to this, aren't you?

"MR. SMALL: I object to that and ask that the jury be discharged.

"THE COURT: I will sustain the objection.

"MR. SMALL: Made for the pure purpose of prejudicing the jury.

"MR. NOELL: I want to show Mr. Schmidt is not a competent man.

"THE COURT: You haven't pleaded it.

"MR. SMALL: I object to this further statement.

"THE COURT: There is no allegation of incompetence or unskillfulness.

"MR. SMALL: I ask that the jury be discharged, if the Court please, after that.

"THE COURT: No. I will permit the case to go on and ask the jury to disregard any reference to the question asked of the witness just now about Mr. Schmidt."

We have observed that in the trial of cases it not infrequently happens that questions are asked which are not only foreign to the issues, but which carry implications that are untrue in fact: such questions are asked for the deliberate purpose of creating prejudice in the minds of the jury, and with the expectation that a protest by adversary counsel, followed by a ruling of the court, will prevent an answer which would in many instances dissipate the intended effect. The practice is unethical and deserving of the severest censure. The incident complained of in the instant case, however, was not thought by the trial court to be sufficiently prejudicial as to require the discharge of the jury. We cannot say that its discretion in that respect was not soundly exercised: appellant's contention under this head is disallowed.

III. The failure of the court to sustain a demurrer to the evidence is assigned as error. In support of this contention it is urged: (1) that plaintiff at the time he received his injury was not employed in interstate commerce; (2) that his injury was due to his own negligence as a matter of law; and (3) that under conceded facts he assumed as a matter of law the risk of the injury which subsequently befell him.

(1) In accordance with a long prevailing custom plaintiff left his engine to rest and cool off: during all the time he was sitting on the rail he held himself in readiness to resume his duties the moment No. 79 had passed and he received a signal that the engine was about to move. This temporary cessation of labor was incidental to his employment, one clearly falling within the contemplation of the parties to the contract of employment. It did not therefore take him without the scope of his employment or remove him,

from employment in interstate commerce. [Carter v. Railroad, 307 Mo. 595, 604, 271 S. W. 358; North Carolina Railroad Co. v. Zachary, 232 U. S. 248.]

(2) When the engine came to a stop on the siding, plaintiff climbed down and sought a cool place in which to rest. The only shade available was that cast by the tender attached to the engine. He could have the benefit of that shade by sitting down on one of the rails: it was customary for appellant's employee's to do that under such circumstances. He knew that, according to an invariable custom of long standing, the engine would not move, either forward or backward, until after the bell on the engine had been rung and he had gotten into his place in the cab. Under such circumstances it cannot be said as a conclusion of law that he was negligent in sitting on the rail as he did.

(3) The negligent acts of the engineer and brakeman alleged to have caused plaintiff's injury could not have been foreseen or expected by him. The doctrine of assumption of risk is therefore without application. [Shaw v. Railroad Co., 282 S. W. 416, 421; Reed v. Director General, etc., 258 U. S. 92.]

IV. Plaintiff's principal instruction, which hypothesized the facts which would authorize a verdict for him, is criticized on a number of grounds. The first is that it required the jury to find that plaintiff was employed in interstate commerce without telling them what was necessary to constitute such employment. On the undisputed facts the court could very properly have instructed that as a matter of law plaintiff was at the time of his injury employed in interstate commerce. But the instruction required the jury to find that "the train upon which the plaintiff was fireman contained loaded cars which were moving in interstate commerce and enroute from the State of Illinois to the State of Missouri and had not reached their final destination." This in connection with conceded facts was clearly sufficient to authorize as a conclusion of law that plaintiff was employed in interstate commerce.

Other criticisms of the instruction, as for example, that it failed to negative the defense of assumption of risk and that it failed to require the jury to find that plaintiff's injury was not proximately caused by his own negligence, are as devoid of substance as the one considered. An attentive reading of the instruction as a whole shows that it was carefully drawn and fairly submitted the issues.

V. The next assignment is this: ''The damage, Instruction No. 3, requested by plaintiff, is erroneous because this instruction does not fix the proper measure of damages, namely, the present cash value, but leaves the jury to roam at large as to the amount they should fix for damages for the injuries shown by the evidence.''

The instruction was correct in its general scope. The defendant made no attempt to point out the proper elements of damages in such cases or to modify the general language of the instruction: it will not be heard to complain now. [Browning v. Railroad, 124 Mo. 55, 71, 27 S. W. 644.]

VI. 1. Appellant complains of the refusal of the court to strike out a portion of the testimony of Dr. Hoge, a medical witness, who had examined plaintiff, not for the purpose of treating him, but for the purpose of giving testimony at the trial. The testimony which appellant sought to have stricken out it describes as follows: ''Each part of Dr. Hoge's testimony repeating and predicating on the statements made to him by the plaintiff, Busch, and particularly his testimony as to pain; also his testimony that, from what plaintiff advised him, he formed certain conclusions of mental and spinal conditions of plaintiff.'' A careful reading of the testimony from the record fails to disclose that any expert opinion given by the witness as to plaintiff's condition was based on statements made by plaintiff; nor does it disclose anywhere a repetition of statements made by plaintiff as to pain or otherwise. The point is without substance.

2. Plaintiff testified over the objections of defendant that he had prior to his injury been promoted to the position of engineer and had worked as such for a year or more; that thereafter, owing to a falling off in defendant's business, he was again reduced to the rank of fireman under the rules of seniority; that if, and when, business picked up he would again be returned to the grade of engineer under the rules; and that he would earn more money as engineer than as fireman. Owing to an objection interposed by defendant, he was not permitted to state how much more he would earn as engineer. The loss of future earnings is of course an element of damages recoverable in cases of this kind. Such earnings must, however, be shown with reasonable certainty, and be not merely speculative in character. Under the rule all the evidence received, and that tendered and excluded, was admissible: it tended to show with reasonable certainty that, in accordance with a fixed rule of promotion, plaintiff would in the near future be returned to the rank of engineer and receive the increased pay earned by that

class of railroad operatives. [Galveston H. & S. A. Ry. Co. v. Ford, 46 S. W. 77, 79; Richmond & Danville Railroad Co. v. Elliott, 149 U. S. 267, 268.]

3. Complaint is made of the closing argument to the jury made by plaintiff's counsel. Defendant offered no objection at the time and consequently saved no exception. The matter is not subject to review.

VII. Appellant insists that, notwithstanding the *remittitur* entered in the trial court, the damages awarded plaintiff are still grossly excessive. This calls for a statement with some particularity of the facts relating to the nature and extent of plaintiff's injuries. As to the manner in which they were received he testified:

"Just as I was glancing at it [passing No. 79] the engine struck me in the side of the head and I got under the engine. When it struck me at the side of the head I tried to get up and my head hit that coupler right behind the engine and knocked me back down so I got underneath the engine and the rods caught my clothes, and finally throwed my leg out between the tank trucks and I tried to get them out and I got these fingers caught and mashed, and just then this leg was cut off, and I managed some way to get this leg out; how I done it I can't say. Just a little bit after that something busted me in the head, busted a big hole in my head, just like a fellow putting a blow torch in front on my head, and that is about all I know. I woke up in the hospital some time after that."

Plaintiff was examined by Dr. Hoge, who testified in his behalf, in December, 1924, and again a few days before the trial, in October, 1925. These examinations disclosed to the witness that the left leg had been amputated above the knee; that portions of the second and third fingers of the left hand were off; that the left collar bone had been broken, with a bad union resulting—the ends of the fragments overlapping from one-half to three-fourths of an inch; that there were scars on the head: one on each side in the mastoid region and one in the left occipital region; and that plaintiff was suffering from a "disorder of the nervous system of an organic nature." The nervous condition, aside from reactions to technical tests, manifested itself by abnormally large pupils which did not react well to the light, and an irritable state of mind. The witness said that this condition *could* be permanent, but he ventured no opinion as to whether it would. The wounds on the head were apparently mere scalp wounds; there was no fracture or concussion. The result of the imperfect

union of the parts of the clavicle was to limit somewhat the movements of the left arm.

Plaintiff testified that he suffered greatly from pain while in the hospital and continued to suffer pain in his back and in the stump of his left leg. He further said:

"I can't sleep; I can't rest; I am restless; I always want to go away, not to stay at the same place. When I read I kind of fix my eyes and always get off the column where I am on and get onto something else. It is a heavy line. I really can't read very much. . . . I have constant headaches, not so severe at times, but very severe at other times, headaches. Can't sleep at night."

Plaintiff was twenty-nine years of age; in good health—normal in every respect; and had earned during the year preceding his injury an average of $178.59 a month.

The pain and suffering, the loss of earnings—past and prospective, and the mutilated body: how much *money* will be a fair and just compensation for these? The caprice and whim of juries seem to have made it necessary for this court to apply as far as may be some standard of uniformity to the amounts of damages recoverable in personal injury cases: the task assumed is difficult and unrelished. Under the proof plaintiff's permanent physical injuries are three: loss of the left leg; loss of parts of the second and third fingers on the left hand; and a shortened collar bone, causing a limitation of the movement of the arm; the evidence does not show with reasonable certainty a permanent impairment of the nervous system. He has suffered great pain and will doubtlessly suffer pain to some extent during the remainder of his life; he is young, and had a considerable earning power just coming into fruition. Whether his injury was in any degree attributable to his own negligence was, under the evidence, for the jury to say: from the size of their award against defendant they evidently held that it was not. Without making a more specific analysis of the elements of his damages, we are disposed to permit a recovery of $25,000.

Other points are raised in appellant's brief but they are fully covered by what has been written.

If the respondent will within ten days enter a *remittitur* of $11,000 as of the date of the original judgment, the judgment will be affirmed; otherwise, it will be reversed and the cause remanded. All concur, except *Frank, J.,* not sitting.