EMMA KING, Respondent, v. ALBERT RINGLING et al., Appellants.

Kansas City Court of Appeals, June 28, 1910.

1. **NEGLIGENCE: Injury in Circus Tent: Sufficiency of Evidence.** Plaintiff while attending defendant's circus, was injured by being struck by a falling board, during a panic created by a violent wind storm. The evidence was insufficient to establish that plaintiff's injury was caused by any negligence on defendant's part.

2. ———: ———: ———: ———. In such a case plaintiff must plead and prove that defendants were guilty of a breach of some duty they owed plaintiff, and that such breach was the proximate cause of the injury. The gravamen of her action must be negligence, and it cannot be established by conjecture, but by proof of a causal connection between negligence and injury.

3. ——: ——: ——: **Presumption.** In negligence, as in other cases, the initial presumption of right acting obtains and continues until overthrown by evidence.

4. ——: ——: ——: **Comparative Duties and Rights of Circus Owner and Patron.** A circus tent not being as substantial as a house or building; a circus patron incurs the risks pertaining to habitations of the former character, provided the circus owner exercises reasonable care to protect his patrons against injury from other than natural or accidental causes. Persons engaged in such business must exercise care commensurate with the needs of the situation.

5. ——: ——: ——: **Res Ipsa Loquitur.** There is no room, under the evidence in this case for the application of the *res ipsa loquitur* doctrine.

Appeal from Buchanan Circuit Court.—*Hon. L. J. Eastin,* Judge.

REVERSED.

*John M. Kelly* and *Rusk & Stringfellow* for appellants.

(1) An inference can be drawn only from facts, and that one inference cannot be based on another inference. Swearingen v. Railroad, 120 S. W. 778; Cahill v. Railroad, 205 Mo. 404; Haynie v. Packing Co., 126 Mo. App. 92. (2) An inference cannot even be based on a presumption of law. Looney v. Railroad, 200 U. S. 480. (3) This is a negligence case. The doctrine of *res ipsa loquitur* does not apply. The principle of *res ipsa loquitur* applies only to those injuries whose mere occurrence implies a breach of duty. Erwin v. Railroad, 94 Mo. App. 289; Kelley v. Railroad, 105 Mo. App. 375. (4) The pulling of the stakes, if any were pulled, was not the proximate cause of the accident. The storm which struck the tent was the immediate agency that did the injury to the tent. It was the efficient cause. The pulling of the stakes was at best only a condition and a trivial circumstance. This being

true, even if it was negligent for defendants' agents to pull such stakes, defendants would still not be liable for the reason that the catastrophe would have happened, and actually did happen, regardless of this circumstance. Kappes v. Brown Shoe Co., 116 Mo. App. 167; Lynch v. St. Louis Transit Co., 102 Mo. App. 630; Stone v. Railroad, 171 Mass. 536; Nephler v. Woodward, 200 Mo. 179.

*Culver, Phillip & Spencer* for respondent.

JOHNSON, J.—This action is to recover damages for personal injuries alleged to have been caused by the negligence of defendants. A trial before a jury resulted in a verdict and judgment for plaintiff in the sum of six hundred dollars, and the cause is before us on the appeal of defendants.

The injury occurred in the city of Maryville in the afternoon of September 18, 1905, at a performance of a traveling show of which defendants were the proprietors. Plaintiff and her husband had paid the admission fee charged by defendants and were occupying "general admission" seats in the "main tent," when a violent storm wrecked one end of the tent and threw the spectators of the performance into a panic. In the general rush to escape, plaintiff was struck by a falling board or timber and one of her legs was broken. The issue of negligence presented by the pleadings and evidence is whether or not the supports of the tent were weakened by the servants of defendants in preparation to break camp during the performance in the circus tent and shortly before the storm broke. Plaintiff contends that such negligence was the proximate cause of the injury, while defendants deny that the supports were weakened and contend that the storm that wrecked the tent was so extraordinary in its suddenness and violence that it should be classed in law as an act of God.

There is no contention that the tent and its supports and fastenings were defective in construction or that any part of the structure and its connections were out of repair, nor is any point made against the manner in which the tent was erected. Plaintiff founds her cause of action on the sole fact, testified to by a number of her witnesses, that after the performance began, alternate stakes at one end of the tent were pulled by a gang of workmen operating a stake pulling machine. The existence of this fact is denied by the witnesses of defendants who say, in the first place, that it would have been impossible to pull stakes before the canvas had been lowered to the ground and, in the second place, that alternate stakes to which certain auxiliary guy ropes were attached could have been withdrawn from use without sensibly diminishing the strength of the actual supports of the tent and since the evidence of plaintiff does not show to the contrary, the presumption should be indulged that only those stakes were pulled, if any, which were not essential to the stability of the tent.

A thorough description of the tent is essential to a proper understanding of the points in controversy. Below in Fig. 1, is a reproduction of a photograph of a perfect model of the tent. Fig. 2, exhibits a detail of the supporting ropes and the stakes to which they were attached.

King v. Ringling.

Fig. 1.

The tent was 440 feet long and 190 feet wide. It had six center poles and three circles of lesser poles to support and give to the canvas necessary elevation and convexity. The center poles were 54 feet long; the poles of the inner circle were 41 1-2 feet long; those of the next circle were 31 feet and those of the outside circle which were set back of the seats for spectators were 14 feet. The frame of the covering consisted of large manilla rope interwoven, to which was sewed the canvas which was of ten ounce drill. The center poles were held in place by independent guy ropes. The covering was ribbed with radiating lines of rope which continued beyond the circumference of the canvas and became the guy ropes by which the canvas was securely fastened to stakes driven in the ground. The main guy

145 App—19

King v. Ringling.

Fig. 2.

ropes were of the ribs pierced by the tops of the outer circle of poles and each was attached to two stakes (numbered 1 and 2 on Fig. 2). These ropes were ten feet apart. Spliced to each at a point near the pole top was another diverging guy rope called a "hook rope" which was fastened to stake No. 3. Midway between each pair of these double guy ropes was a single guy rope which also formed a part of the framework of the covering and which was attached to stake No. 4. This construction gave to each five feet of canvas circumference a group of three guy ropes attached to four stakes in all. The ropes were one inch manilla and each had a breaking strain of 9000 pounds. The stakes were 4 1-2 to 5 1-2 feet long. The soil into which they were driven was tenacious and it was found that the wreck of the tent had not pulled up any stakes, nor had it broken any of the guy ropes. The seat structure was entirely independent of the tent. There was a framework of jacks and stringers not in any way connected with the tent or its supports and the seats consisted of boards held in place but unattached to the framework. These boards were displaced in the panic and it is likely that one of them, in falling, broke plaintiff's leg. The canvas curtains that depended vertically from the circumference of the covering or roof were fixed in a way to prevent wind from blowing in under the roof but they could be easily opened to afford ready egress from the tent. The general direction of the tent lengthwise was east and west. On the north side were three separate dressing tents. On the south were the menagerie and various other tents. The entrance to the main tent was through the menagerie.

Plaintiff and her husband were seated about midway in a tier of general admission seats on the north side of the tent. It had been a rainy day without any indication of a windstorm. The spectators in the tent heard it thunder and begin to rain. Then it grew dark and the wind began to blow very hard. Symptoms of

panic appeared and the ringmaster tried to reassure the crowd but with little or no success. The wind filled the tent and caused it to swell and sway. The ringmaster called to the people to "crawl under the seats so that if the large poles fall down the seats will protect you from them." The force of the swell of the canvas was enough to lift the poles clear of the ground. Plaintiff and her husband crawled under the seats. The west end of the tent collapsed owing to the breaking of the poles at that end, and that time plaintiff was injured by being struck by a board which probably was one of the seats. There were about twenty-five hundred persons in the tent and, naturally, there was great confusion. The wind was of brief duration, reaching its climax within a few moments after it began to blow, and during that time the efforts to escape from the tent became general. The frightened people did not confine themselves to the regular exits but many forced their way through the sides of the tent. The framework of the seats remained intact, but the loose boards which formed the seats were found scattered around where the people had disarranged them in seeking safety.

The evidence respecting the violence of the storm is conflicting. Many witnesses say they had been in storms where the wind blew harder; others that it was the strongest wind they had experienced. All agree that it was a very hard wind and the physical facts show that it possessed great destructive power. The evidence is voluminous and we shall not go into the details relating to the characteristics of the storm. Summarized, it establishes beyond controversy the existence of the following facts:

1st. The wind storm was unheralded and appeared suddenly.

2nd. The wind was not rotary but undulatory.

3rd. The destructive path was very narrow and the period of destruction brief—not longer than two or three minutes.

What we shall say of the questions presented by the demurrer to the evidence will dispose of the case.

It devolved on plaintiff to plead and prove that defendants were guilty of a breach of some duty they owed plaintiff and that such breach was the proximate cause of the injury. The gravamen of her action, if one exists, must be negligence, and to be entitled to a recovery, her evidence must not leave the inference of actionable negligence open to conjecture or speculation but must show a causal connection between the alleged negligent act and her injury. Tents, however well constructed and erected, are not as substantial as other structures for housing people and in voluntarily occupying the tent of defendants, plaintiff assumed all the natural and inherent risks pertaining to habitations of that character. On the other hand, in inviting the public to occupy their tents for their own profit, defendants bound themselves to exercise reasonable care to protect their invitees against injury from other than natural or accidental causes. Persons engaged in the business of providing public amusements must observe care commensurate to the circumstances of the situation to protect their patrons against injury. They must act with the care to be expected of an ordinarily careful and prudent person in their position.

This is not a case for the application of the rule of *res ipsa loquitur*. The mere fact that the tent collapsed in a severe windstorm will not support an inference of negligence, nor should such inference be held to arise from the additional fact that defendants had begun "pulling up stakes" preparatory to "folding their tents." The burden was on plaintiff to show that the pulling of the stakes sustained a causal relation to the collapse of the tent. We shall concede that defendants' contention that stakes could not be pulled until after the tent was lowered is presented by the evidence as a debatable issue of fact and, for present purposes, shall assume that each alternate stake had been pulled be-

fore the advent of the storm, but in the absence of contrary proof, it is our duty to presume that the stakes were pulled which would least affect the security of the structure. In negligence, as in other cases, the initial presumption of right acting obtains and continues until overthrown by evidence.

Turning back to Fig. 2, it will be observed that the stakes of each group of four that bear the numbers 1 and 3, could be pulled without in any manner *widening* the distance between the guy ropes that fastened the tent to the ground. Stake 1 was but an additional anchor for a main guy of which stake 2, was the main anchor. Stake 3, was the anchor of an auxiliary guy that, if put to use, could only affect the holding power of the main guy. The withdrawal of stakes 1 and 3 still left each rib of the roof of the structure attached to the ground and, as we said, did not enlarge the space between the supporting guy ropes. Had any of the stakes numbered 2 and 4, been pulled out by the storm, or had any of the guy ropes been broken, a causal connection would have been shown between the pulling of stakes 1 and 3, and the collapse of the tent, but no such result was disclosed and we fail to perceive how it can be said that defendant weakened supports which did not yield to the storm but remained intact. Nor can it be said with reason that the pulling of the stakes had anything to do with the inflation of the tent. Had any of the supports given way under the strain of the storm, one could understand readily how, by widening the distance between the holding guys, an entrance might be given to the wind, but with every support remaining sound and taut, what opening could have been given the wind that would not have been offered had no stakes been pulled? Doubtless the wind found its way into the tent through many apertures some of which were opened in the side walls by the outrushing people.

Unquestionably, the collapse was due to the breaking of the poles, and this was caused by the violent

whipping of the canvas under successive inflations and deflations. In the grip of this mighty power the heavy poles were but as reeds. We say that the plain and undisputed physical facts of the situation fail to show any relation between the injury of plaintiff and the negligence asserted. If these facts left any room for a reasonable difference of opinion, we would say that an issue of fact was in the case for the triers of fact to solve, but there is no room for a reasonable difference of opinion and it is our duty to hold as a matter of law that plaintiff has failed completely to sustain her burden of proof. Moreover, we think the storm was of such a nature that no reasonable man in the situation of defendants would have anticipated its sudden visitation. But it is not necessary to go into that subject since, in what we have said, we have disposed of the case.

The judgment is reversed. All concur.