AUGUST VIERMANN BRICKLAYING COMPANY v. ST. LOUIS CONTRACTING COMPANY, Appellant.—73 S. W. (2d) 734.

Division Two, June 19, 1934.

*Holland, Lashly & Donnell, Holland, Lashly & Lashly* and *Oliver J. Miller* for appellant.

536

*Martin Farrow* for respondent.

FITZSIMMONS, C.—Plaintiff, August Viermann Bricklaying Company, as employer, brought suit under Section 3309, Revised Statutes 1929 (12 Mo. Stat. Ann., p. 8244), for damages for personal injuries suffered by its employee, August Viermann, Jr., caused, as pleaded, by the negligence of defendant. Plaintiff recovered judgment in the Circuit Court of the City of St. Louis for $30,000 from which judgment defendant duly appealed. Errors assigned are the refusal of the trial court to sustain defendant's demurrer to the evidence, the giving of certain instructions on behalf of plaintiff, the refusal to give certain instructions requested by defendant and the excessive amount of the verdict.

The allegations of the petition in substance were as follows: Both plaintiff and defendant are corporations. August Viermann, Jr., was employed by plaintiff as a bricklayer, and both he and plaintiff were subject to the Workmen's Compensation Act. On November 21, 1927, plaintiff, as a bricklaying company and defendant as a stonemason company were separately and independently employed by a principal contractor in erecting the walls of the boiler house of the

St. Louis City Water Works then in course of construction in St. Louis County. The wall on which plaintiff and defendant were at work that day consisted of an exterior stone wall which defendant was building and an interior brick lining or veneer which plaintiff was erecting. On the day stated, when the stone wall had reached a height of thirty-five feet and the brick lining a height of thirty-six feet, and while plaintiff's employee, August Viermann, Jr., was standing on a scaffold near the top of the lining, a large portion of the upper part of the lining fell against him and caused him to fall thirty feet and to suffer serious injuries.

The upper courses of the brick lining were fresh, soft and unset and therefore temporarily weak and likely to fall and collapse from unusual external force, the petition charged, knowledge of which condition was imputed to defendant. The negligence alleged was that the wall, in the condition stated, was caused to fall and to produce the injuries suffered by August Viermann, Jr., by defendant's servants in (a) negligently building the stone wall out of plumb thereby producing an excess of four or five inches over normal in the space between the two walls, brick and stone, and in filling the space with a mortar composed of sand and cement which were too heavy for the brick lining to support; (b, c) in dropping or throwing into the space heavy stone slabs or spauls which were too heavy for the brick lining to support and were too thick for the space; (d) in knocking a heavy stone against the lining with more force than it could withstand; and (e) in attempting to correct the deficiency in the specified thickness of the stone wall by adding mortar and slabs the weight and pressure of which was too great for the brick veneer to withstand.

The answer was a general denial and certain affirmative pleas. The first of these defenses was a custom by which the mechanic, stone-mason, or bricklayer, who raised his part of the wall above that of the other, inserted in the joints of his building material certain metallic wall ties with ends projecting toward the other portion of the wall. When the other mechanic came up with his structure it was his duty to insert in the joints the loose ends of the wall ties, and to place mortar in the space between the stone and brick walls. On November 21, 1927, a section of the stone wall had been finished for about a week to a height of five feet above the adjoining brick veneer. On that day, plaintiff, acting through its foreman, August Viermann, Jr., and other servants erected the brick lining in the section mentioned to a point one foot above the stone work. In so doing plaintiff omitted to insert in the brick the wall ties projecting from the stone and also omitted to place mortar between the two walls. The answer charged that this section of the brick veneer, so built without wall ties or mortar between the brick and stone, was dangerous, not reasonably safe and liable to fall and that it did fall

as a result of the manner of its construction by plaintiff. Contributory negligence was separately charged to plaintiff and to August. Viermann, Jr., for the reason that they knew or should have known that the section of brick veneer when so constructed without ties or mortar between the two walls was improperly erected and not reasonably safe, and was likely to fall, and that both plaintiff and Viermann, Jr., knowing these facts, he stood on the scaffold near to the section of brick wall in a position of peril. There also was pleaded separately against plaintiff and Viermann, Jr., the assumption of risks incident to the described method of building the brick wall and to the presence of Viermann amid these surroundings. A final defense was that whatever filling in between the brick and stone was done on the day of the accident was by one of defendant's stonemasons who acted, not within the scope of his employment, but at the request and in the presence of Viermann, with the knowledge and consent of plaintiff and of Viermann.

Some facts admitted, or not seriously disputed, were these: The entire wall, stone and brick, was twenty-four inches wide. The brick were white enameled on the face fronting the interior of the boiler house. The veneer was the width of one brick, that is, it was three and one-fourth inches thick. The stone took up the rest of the thickness of the wall, save a space which mechanical or structural necessities made it necessary to leave between the two materials. The style of stone work required by the building specifications was described as rubble masonry. This consists of a wall made of rough irregular pieces of broken rock, laid on their natural bed or stratum base. There was to be a general distribution of large and small stones, and a lack of continuity of horizontal joints. A projection or deflection of not more than three-fourths of an inch from the normal face of the wall was permitted by the specifications. Just as there were projections on the outer face of the roughly hewn building stone, there were like irregularities on the inner face next to the brick veneer. These structural irregularities were the principal cause of the necessary space between the brick and the stone. A width of one inch for this space appears from all the testimony to have been sufficient and perhaps normal. Vertical steel columns, obviously intended to carry the load of a high, heavy and large roof, divided the brick veneer into panels of varying widths of ten, twelve, and sixteen feet. The two walls, brick and stone, were advanced upwardly with what appears to have been a common intent that neither wall outstrip or unduly overtop the other at any point. And so the brickmasons and stonemasons worked now in one panel and next in another. Each trade had a scaffold, the bricklayers on the inside and the stonemasons on the outside of the wall. Another fact, not seriously questioned, was that the stone wall stood solidly and safely from the moment of construction. But sections of the brick wall, one

brick thick, were in danger of collapse if they were subjected to sufficient pressure before the mortar had set. This process of setting was slow, requiring at least twelve hours, in the colder months. And the accident happened in the latter part of November. Bricklayers' mortar weighed one hundred and ten pounds and stonemasons' mortar one hundred and twenty pounds to the cubic foot. The stonemasons used more cement and less lime putty in their mortar than did the bricklayers.

Plaintiff did not deny the custom which imposed on the subcontractor who at a given point was behind or rather below the other, the duty to insert the wall ties and to fill in the space between the two walls. But by way of exception to the custom, plaintiff produced testimony tending to prove that, at an early stage of the construction of the combination stone and brick walls of the boiler house, plaintiff complained to the general contractor, Dunham Construction Company, that defendant, by the fore-shortening of stone at some places in the wall, was leaving a space between the two wall structures of two, three, or even four inches, which space plaintiff, following up with his brick work, objected to filling. These witnesses also testified that, as a result of this complaint, the superintendent of the Dunham Company brought about an agreement by which, if the space in any instance was one inch or less, the bricklayers should fill it and if the space was wider than one inch the stonemasons should fill it. Defendant offered testimony to the effect that no such agreement had been made.

After the lunch hour on November 21, 1927, two bricklayers, Krueger and Volk, employed by plaintiff, began to lay brick in a panel on the south wall of the boiler house. The panel was about ten feet six inches wide. The top of the brick work at the time that the two men began work at this point was about five feet below the top of the stone work. As the top of the stone work was about thirty-eight feet from the ground, the top of the finished brick work was about thirty-three feet high. The scaffold on which Krueger and Volk were standing was about thirty feet high. This was the scaffold from which August Viermann, Jr., fell a few hours later. Viermann, Jr., plaintiff's foreman, was on the scaffold shortly after the two bricklayers resumed work about 12:30 p. m. He testified that Volk called his attention to the fact that owing to the deflection of the stone wall in the panel from a true plumb line, the space between the two walls when the brick wall would be raised five feet higher to a level with the rock, would vary from one inch at the bottom to four and one-half inches at the top. Viermann then summoned Sam, one of defendant's stonemasons who was working on another wall of the boiler house, and inquired of him what about the deflection of the stone wall. Sam answered, Viermann testified, that the bricklayers should go on running the brick wall up and that he,

Sam, would take care of the fill later. Viermann further testified that he then instructed the bricklayers to lay the brick in the panel but not to fill in the space because it was too extreme. After giving these orders, Viermann left the scaffold and went about his other duties. The bricklayers carried the brick work in the panel five feet to the top of the stone wall and one foot higher, a total of six feet of new wall, and about four o'clock they moved to another panel.

Viermann returned to the scaffold in front of the newly constructed veneer about 4:20 P. M. He was standing with his back to the wall and was leaning on a pony scaffold. He was looking at his watch, and was about to determine whether there was enough material on hand to keep the men busy until quitting time, when the newly laid brick veneer fell from place and swept him off the scaffold to the boiler house floor thirty feet below. Viermann testified that he did not see Sam or anyone else that afternoon filling in the space between the two walls at the panel concerning which he had spoken to Sam, and that if he had seen Sam filling in that afternoon, he would not have remained on the scaffold in front of the new work. Viermann expressed the opinion that, after the new wall had been in place about twelve hours, the mortar holding the bricks together would have set sufficiently to make safe the work of filling in. He further testified that the newly constructed panel of brick, without ties or mortar binding it to the rock wall, would stand in the absence of pressure, and that stonemasons' mortar thrown into the space between the two walls could exert pressure enough to throw over the new wall. Other witnesses by their testimony indorsed these two opinions expressed by Viermann. Kiel, an apprentice bricklayer, working for plaintiff, saw Sam, the stonemason, working on the wall above the panel which fell about half an hour before the accident. Stevens, a hodcarrier for plaintiff, saw Sam filling in fifteen minutes before the accident. Neither Kiel nor Stevens testified that Viermann was on the scaffold at the time they saw Sam on the wall. The scaffold on which Viermann was standing when he was thrown off was on the inside of the building and was nine feet below the top of the brick panel, after the bricklayers, Volk and Krueger, had quit working there. The top of the brick panel was one foot higher than the top of the outside stone wall according to plaintiff's witnesses and two feet higher according to Sam, the stonemason. Sam worked on a pony scaffold outside the wall. But at the moment of the accident he was down from the wall top and on the platform of the main scaffold mixing material. We deem important for the determination of the demurrer these facts in evidence touching Viermann's knowledge or want of knowledge, or opportunity for knowledge that, at the time that he stood on his own scaffold Sam, the stonemason, on the other side of the wall, screened by the overtopping brick veneer, was filling with mortar the space between the two walls.

Sam Zubcic, the stonemason on the other hand, testified that on the afternoon of the accident, Viermann requested him to fill in between the two walls. Sam refused, saying it was the work of the bricklayer since the latter was building his wall after the stone wall was up. Sam compromised by suggesting that Viermann see the stonemason foreman who was at another building. Viermann departed, Sam testified, and returned later with the statement that the foreman said Sam should do the filling in. A statement, incidentally, which the foreman at the trial, denied he had made. Upon the word of Viermann of the foreman's sanction, Sam went to a point on the rock wall adjoining the newly built brick veneer, looked at the work, and said to Viermann: "Gus, that wall is too green. If I was to fill that up now, that would fall over." But Viermann insisted that Sam fill the space with mortar before a city inspector came around. So Sam set to work under the eyes of Viermann, and the accident soon followed. Viermann denied this testimony of Sam.

■ I. Defendant advances several reasons why the trial court should have sustained its demurrer at the close of all the evidence. His first contention is that the case falls within the rule of law expressed in the maxim: *Volenti non fit injuria,* which is freely translated in 40 Cyc. 217, as: "That to which a person assents is not esteemed in law an injury." In the cases cited by defendant in support of this point there is present the fact or opportunity of knowledge on the part of the person injured of the impending peril. For example in Atherton v. Kansas City Coal & Coke Co., 106 Mo. App. 591, 81 S. W. 223, plaintiff sued for personal injuries suffered by being struck by a lump of coal which defendant's driver threw into plaintiff's shed. Plaintiff had given the wagon driver specific instructions how the coal should be placed in the shed and she requested him to throw in some large lumps so that they could be piled in the doorway. The plaintiff was in the act of lifting a lump in furtherance of her storage plan when she was struck and injured by some coal thrown from the wagon. The court held that the plaintiff assumed the risk of any hazard incident to the compliance of the driver with her directions as to the method of unloading coal.

In the instant case the "assent" which the maxim would exact of August Viermann, Jr., should include his voluntary presence on the scaffold near the newly laid brick at a time when he knew or should have known that Sam, the stonemason, was filling or had recently filled the space between the brick and stone walls. Under the rule of construction favorable to plaintiff which we must give to the evidence in passing upon defendant's demurrer, we cannot find as a matter of law that Viermann knew or should have known that the space was being filled or had been filled. What we have said answers defendant's further contention that Viermann knew the danger and therefore that he was guilty of contributory neg-

ligence as a matter of law, and also that he was charged with knowledge which he could have obtained by the exercise of ordinary care.

There was substantial evidence that the material of the collapsing brick work fell to the floor of the boiler house to which Viermann also fell, and that in the debris there was stonemasons' mortar and rock spalls. There was also evidence that under the Workmen's Compensation Act, plaintiff, as employer, had paid certain sums to August Viermann, Jr. We are of opinion that the demurrer to the evidence rightly was overruled.

II. Defendant assigns several errors to plaintiff's main instruction. The first paragraph of the instruction stated the substance of Section 3309, Revised Statutes 1929 (12 Mo. Stat. Ann., p. 8244), which subrogates the employer to the rights of the employee when a third person is liable for the injury of the employee. Defendant objects that this portion of the instruction is erroneous because it assumes that an amount was paid or payable to August Viermann, Jr., as compensation under the act and also assumes that Viermann would be entitled to recover some amount from defendant. The first paragraph of the instruction stated the substance of the applicable statute so that the jury might know by what rule, or enactment, of law one corporation might sue another for damages on account of injuries to an employee of the first. The remainder of the instruction hypothesized the facts under which plaintiff might recover. The last paragraph of the instruction required the jury to find from the evidence as essential to a verdict for plaintiff that plaintiff on or about September 5, 1929, paid to August Viermann, Jr., $1760 on account of compensation under the act. This objection is without merit.

It is next objected that the third paragraph of the main instruction is erroneous in that it predicates recovery upon a finding that August Viermann, Jr., was exercising ordinary care for his own safety when there was no evidence to that effect. In our opinion there was evidence sufficient to submit to the jury the question whether Viermann was exercising ordinary care.

A third ground of attack is that there was no evidence to warrant the submission to the jury of the issue whether a stonemason threw stone spalls or mortar or both into the space between the two walls and that the pressure of these materials caused the brick veneer to fall against Viermann. As we read the record there was sufficient evidence, direct or circumstantial, on this point.

III. Defendant assigns error to plaintiff's given Instruction 2 on the measure of damages. The first objection is to the clause of the instruction: "For loss of earnings, if any, not to exceed $7,000, which you find and believe from the evidence he

(Viermann, Jr.) sustained from November 21, 1927, to this date." It is objected that mention of the sum $7,000 is bad practice and that this sum is nowhere mentioned in the petition. The petition charged among other things that August Viermann, Jr., by reason of his injuries "lost to date (i. e., of filing the petition, September 10, 1929) $4,950, and in future will lose a large sum in earnings." The words, "To this date," in the instruction, meant to the date of the giving of the instruction, at the close of the trial, on October 28, 1931. The instruction was not erroneous in this respect.

Complaint also is made of the use of the word "distortion" in the instruction, which authorized the jury to allow damages to plaintiff for permanent disability, if any, suffered by Viermann, Jr., "directly caused by said injuries, if any, as follows: . . . (2) the enlargement, deformity, distortion, if any, of his right ankle, foot, heel and toes." The objection is that the petition contains no averment warranting the use of the word "distortion." The petition alleged that the right foot "is out of alignment both as to length and breadth, or is 'twisted,' " etc. We are of opinion that the word "twisted" authorized the use in the instruction of the word "distortion."

IV. Defendant urges that the trial court erred by refusing to give requested Instructions F and G. The court gave at the instance of defendant a contributory negligence instruction, Number 3. This latter instruction predicated a verdict for defendant upon a finding by the jury that prior to November 21, 1927, defendant erected a section of the stone wall to a height of five feet or more above the then height of the brick veneer; that on November 21, 1927, Viermann, Jr., caused the corresponding section of the brick wall to be raised one or two feet higher than the stone wall without causing mortar to be placed between the two parallel structures; that by reason of this mode of construction the section of brick wall was likely to fall at any time and injure any one in the vicinity, and therefore was dangerous and not reasonably safe; that Viermann, Jr., knew or by the exercise of ordinary care could have known of this situation; that he, in causing the brick wall to be so erected, failed to exercise ordinary care for his own safety, and that this failure on his part directly contributed to his injury.

Defendant's refused Instruction F differed from given Instruction 3 by the substitution for the contributory negligence paragraph of the following statement of the assumption of risk doctrine: "and if you further believe and find from the evidence that whatever dangers, if any, existed in said August Viermann, Jr., being stationed in the immediate vicinity of said portion of said section of brick wall were open and obvious and were known to said August Viermann, Jr., then and in that case said August Viermann, Jr., assumed what-

ever risks, if any, there were in being stationed amid said surroundings on the occasion mentioned in the evidence, and plaintiff is not entitled to recover against defendant, and you will find your verdict for the defendant.''

It has been rightly said that few subjects of the law have a more obscure and complicated terminology than that appertaining to the doctrine of assumption of risk. And commentators usually have concluded that a reconciliation of all the statements relating to the subject is an impossible task. [18 R. C. L. 671, citing 49 L. R. A. 50; 28 L. R. A. (N. S.) · 1215; 18 Ann. Cas. 961.] The question whether the court erred in refusing to give instructions predicated on assumption of risk can be judged by Missouri decisions. Therefore we shall try to avoid confusion by making only limited references to the divergent views of other jurisdictions. The doctrine of assumption of risk had its origin in the law of master and servant. [Priestly v. Fowler, 19 Eng. Rul. Cas. 102, decided in 1837.] It developed within that scope, and some states confine it to that field. Other states however, give it a wider application. [See Gover v. Central Vermont Ry. Co. (Vt.), 118 Atl. 874, l. c. 876.] Missouri courts have recognized the doctrine as having a place in a proper case of a passenger against a carrier. [Fillingham v. St. Louis Transit Company, 102 Mo. App. 573, 77 S. W. 314.] Spectators, witnessing a performance in a circus tent assume ''all the natural and inherent risks pertaining to habitations of that character'' (King v. Ringling, 145 Mo. App. 285, 130 S. W. 482, l. c. 484). And a judgment for damages on account of injuries imputed to the negligent use of X-rays by a physician was set aside and the cause remanded for the reason that the trial court excluded evidence of an agreement that plaintiff would assume the risks incident to the application of X-rays to an afflicted hand. [Hales v. Raines, 162 Mo. App. 46, 141 S. W. 917.]

Certain rules of limitation of the doctrine of assumption of risk clearly appear from the Missouri cases. Such of those rules as are in point here may be stated thus: (1) the defense of assumption of risk is one which must rest on contract. [Fillingham v. St. Louis Transit Company, supra; Curtis v. McNair, 173 Mo. 270, 73 S. W. 167; Biskup v. Hoffman, 220 Mo. App. 542, 287 S. W. 865, where it was held that the doctrine did not apply, the plaintiff caddy not having been in the employ of the defendant · golf player.] (2) Where negligence, primary or contributory, is present, the doctrine of assumption of risk has no place. In the case of the circus tent which blew down, the plaintiff only assumed ''the natural and inherent risks.'' On the other hand, defendants bound themselves to exercise reasonable care to protect their invitees against injury from other than natural or accidental causes. [King v. Ringling, supra.] In the case of the patient injured by X-rays, the court said:

"Though plaintiff should be regarded as having assumed by his express agreement such risks as attend the employment of the X-ray, this agreement essentially implied a careful and skillful application thereof on the part of defendant." [287 S. W. 865, 1. c. 869.] And in Curtis v. McNair, supra, this court said, 73 S. W. 1. c. 168: "A servant assumes the risk of danger incident to the work he engages to perform, and, if he is injured as a result of that which was to be expected in the usual course of such work, the master is not liable." The first statement of the rule in Priestly v. Fowler, supra, was: "By the law of England, so far as not altered by statute, the master is not responsible to a servant for the ordinary risks of the service." Missouri decisions have confined the doctrine to these limits. (3) The last and most uniform rule in every jurisdiction is that where the relation of master and servant exists, the doctrine of assumption of risk governs the conduct of the servant and not that of the master.

Fitting those rules to the facts here we find (first) no contractual relation of August Viermann, Jr., which entitled defendant to have the law of assumption of risk applied by an instruction to the same state of facts upon which the court at defendant's request gave an instruction on contributory negligence. Second, under all the evidence, the falling of the wall was due either to the negligence of defendant or to the negligence of plaintiff or to the negligence of defendant and the contributory negligence of plaintiff or of Viermann, Jr. By the evidence of plaintiff, the freshly laid brick wall, without mortar thrown in behind it as it was being built, was safe if not subjected to pressure. But defendant negligently put on the pressure by means of mortar thrown into the two structures of brick and stone. By the evidence of defendant the green wall, standing alone, was not safe but was negligently constructed. By the evidence of all witnesses on the point, the erection of the brick veneer wall, to a height of six feet without ties or a backing of mortar being inserted as the work progressed and the subsequent throwing in of mortar was contrary to the general custom of the trade, and was at least an exceptional mode of construction, not contemplated by the building specifications. Third, if Viermann, Jr., gave orders to Sam, the stonemason, to fill the space between the walls as the latter testified, and if we assume that thereby a *quasi* relation of master and servant between these two men was created, yet in that case Viermann was the master and Sam the servant. Under every applicable rule, therefore, the court did not err by refusing to give defendant's instructions on the assumption of risk.

■ V. Defendant assigns error to the refusal of the court to give six requested instructions each of which withdrew from the consideration of the jury a specific assignment of negligence. Plaintiff submitted the case to the jury on a given negligence instruction.

We have examined that instruction and have held it to be good against the attacks made upon it. We need not repeat its substance or quote its text here. In the case of Perryman v. Missouri Pacific Railway Co., 326 Mo. 176, 31 S. W. (2d) 4, l. c. 7, this court ruled: "The matters sought to be withdrawn from the jury were abandoned by plaintiff's failure to include them in the instructions requested and given. In such case it is not reversible error to refuse such withdrawal instruction," citing Reith v. Tober, 320 Mo. 725, 8 S. W. (2d) 607; Siberell v. Railway Co., 320 Mo. 916, 9 S. W. (2d) 912; Clift v. Railway Co., 320 Mo. 791, 9 S. W. (2d) 972. That rule applies here.

VI. As we have stated, the verdict was for $30,000. Defendant contends that the trial court should have sustained the motion for a new trial upon the ground that the amount of the verdict was so grossly excessive that it was the result of bias and prejudice. Plaintiff on the other hand insists that the amount is inadequate. For the decision of this assignment we will now state the nature of the injuries, the losses and expenses suffered and incurred by August Viermann, Jr.

When Viermann fell thirty feet from the scaffold to the concrete floor of the boiler house, it is obvious that he alighted on his feet. The only injuries charged are fractures of the bones and lacerations of the muscles, tendons and flesh of the right foot, heel, ankle and leg below the knee and at the knee joint; fracture of the lower left leg; fracture and dislocation of the thumb and three fingers of the right hand; bruising of the right hip. The permanent injuries charged are: The right thumb is stiff and cannot be bent against the fingers. He is unable to close or grip tightly with the right hand. His right foot is enlarged, deformed and "twisted," so that he has to wear a specially made shoe. Below the right knee there is a bony enlargement which prevents him from kneeling. There was ample evidence to support these allegations of his injuries and the permanent effects of them. When physicians and surgeons examined Viermann at a hospital soon after he fell, they found that his right foot was attached to the leg solely by muscles and flesh at the heel. Some were for completing the amputation, but by skillful surgery the foot was rejoined to the limb and Viermann recovered the use of it. But it is permanently turned outward, as an attending surgeon testified. Viermann testified that he can walk for an hour or two, but after that, this form of activity becomes difficult. He also stated, with reference to his use of a bricklayers tools, that perhaps he could hold a trowel in his right hand, but he did not think that he could hold a job at the trade of a journeyman bricklayer. At the time of his injury and for sometime before, he was foreman for the plaintiff company, control of which rested with his father. As foreman he would not have to use a trowel or to kneel. Both of these

acts he would have to perform if he worked as a journeyman. In the years of depression following October, 1929, there were no large jobs requiring the service of a foreman.

Viermann testified that during the year preceding his injury on November 21, 1927, he earned as foreman about $3,200 at the rate of $1.75 per hour, and that he worked in the same capacity about one and one-half years during the period of nearly four years from his injury in November, 1927, to the trial in October, 1931. While he frankly stated that, during the years of depression, there were few jobs that could afford the overhead expense of a foreman, yet he gave it as his estimate that he lost in earnings by reason of his injuries about $7,000. This estimate clearly is on a basis almost of full time at $3,200 per year during the period of two and one-half years that he was idle without allowance being made for the slump in building activity, which is a matter of common knowledge. His testimony warrants the inference that his efficiency as a foreman has not been lowered materially. Viermann was in hospital for eleven weeks after his fall. Beyond doubt he suffered great shock and much pain. His recovery of the use of his right leg, subject to the limitations mentioned, was very remarkable. But we must take it merely as a fact in passing on the question of the excessiveness of the verdict. He does not appear to have been obliged to use crutches or a stick. His hospital and nursing bills, physicians' charges and some minor expenses amounted to $2,896.75. At time of trial, Viermann was forty-one years old.

We are of opinion that the verdict was excessive. But we do not feel warranted, by that error, to grant a new trial, under the whole record before us, without first giving to plaintiff an opportunity to enter a *remittitur* of such part of the judgment as we may deem to be excessive. Other cases are only advisory. We have examined the many decisions involving questions of excessive verdicts cited by plaintiff and defendant. In our judgment $6,000 should be reasonable compensation for Viermann's loss of earnings to time of trial and for his hospital and doctors' bills, the total amount of which is definite and reasonable. In addition the allowance for pain and suffering, for permanent injuries and for other elements of damage should not exceed $12,000. If therefore, within ten days from the delivery of this opinion, plaintiff will enter a *remittitur* of $12,000 upon the judgment of $30,000, the judgment of the trial court will be affirmed in the sum of $18,000 as of the date of the judgment in the circuit court. Otherwise the judgment for $30,000 will be reversed, because it is excessive, and the cause will be remanded. *Cooley* and *Westhues, CC.,* concur.

PER CURAM:— The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. *Ellison, P. J.,* absent; *Tipton,* Acting *P. J.;* and *Leedy, J.,* concur.