## BENNETT v. GILLETTE MOTOR TRANSPORT CO., Inc.

No. 1822.

District Court, W. D. Missouri, W. D.

Dec. 19, 1944.

Chet D. Vance and Ira B. Burns, both of Kansas City, Mo., for plaintiff.

Cowgill & Popham and Sam Mandell, all of Kansas City, Mo., for defendant.

REEVES, District Judge.

This case was tried to the court without the intervention of a jury, a jury having been expressly waived. The case was submitted upon the evidence and arguments of counsel.

An immediate decision was not rendered for the reason that it seemed desirable to review the evidence and the law applicable to the facts in the case. This was particularly made necessary because there was an intermission in the trial. All the witnesses were not available at the first part of the trial. Counsel for the defendant had requested that a physical examination of plaintiff be made, and, in accordance with the agreement of the parties, a physician was appointed by the court to make such examination. This was done at the close of other evidence, and, subsequently, at the convenience of the parties the examining physician gave testimony on his findings.

The pleadings disclose the following issue or issues:

The plaintiff, a resident of Missouri, was operating a truck on behalf of Southern Transit Company, on Highway No. 66, and had reached a point where it enters the city of Claremore, Oklahoma, from the north. Said Highway No. 66 intersects the Missouri Pacific Railroad at that place. The plaintiff had stopped his truck on the north side of the railroad track, because of warning signals automatically displayed by the railroad company, indicating the approach of a railway train. A truck being operated on behalf of the defendant was likewise being driven southwardly on the same highway and following or behind the truck operated by the plaintiff. Defendant's truck did not stop before it collided with the left rear part of the truck operated by the plaintiff. It was a severe and destructive collision. The plaintiff suffered multiple grave and severe injuries, and both trucks were greatly damaged. The defendant by its answer denied the averments of the complaint, admitting, however, that it was a corporation doing business as a motor carrier of freight through Missouri and Oklahoma. As an affirmative defense it stated "that if the plaintiff sustained any injuries at the time and place mentioned in his petition, which this defendant denies, any such alleged injuries were caused or directly contributed to by the negligence of the plaintiff in operating his said truck at said time and place without any taillights thereon."

Upon the issues thus made, testimony was offered.

The evidence on behalf of the plaintiff supported the averments of his petition. It showed that plaintiff approached the railroad track at about 3 o'clock in the morning of March 10, 1944, from the north. Plaintiff observed and obeyed the signal lights and brought his truck, consisting of a tractor and trailer, to a standstill approximately 25 feet north of the track. The lights on his truck were burning, and particularly was it emphasized that the lights

on the rear were burning and were serving their purpose to warn cars approaching from behind. There was no countervailing testimony regarding the lights on the rear of the truck or trailer operated by plaintiff.

On behalf of the defendant the evidence as given by the driver of the defendant's truck was that as he approached the crossing, and when approximately 150 to 200 feet back of the railroad track, he experienced pain over one of his eyes and that he "passed out" or became unconscious and was not aware of what happened until several days thereafter. Relating to this evidence on behalf of the defendant several witnesses testified that after defendant's driver had been taken to the hospital at Claremore he was not only rational but made statements as to the cause of the accident. In one statement he said that he had become sleepy and, in substance, had vainly been fighting sleep, and that this occasioned the accident. In another statement he said that the lights on the truck operated by the plaintiff were out, and he thereby supported the averments of the defendant, that the plaintiff was negligent "in operating his said truck at said time and place without any taillights thereon."

1. Predicated upon this evidence and other evidence to be stated as it may become pertinent, it becomes the duty of the court to make findings of fact. Such testimony relates to the question of liability. Liability or non-liability should first be determined before considering the matter of claimed damages.

Findings of Fact on the Subject of Liability:

(1) The plaintiff stopped his truck as he approached the railroad crossing from the north at approximately 25 feet from the railroad track.

(2) Plaintiff's truck carried burning or lighted taillights and these were adequate to warn motor vehicles behind plaintiff's truck.

(3) The collision occurred as alleged by plaintiff and defendant's truck was propelled with great force into the left rear of the truck operated by plaintiff.

(4) The driver of defendant's truck was irrational immediately after the collision but the evidence was controverted as to whether he was rational or irrational when taken to the hospital immediately after the accident. The owner and operator of the hospital, a graduate nurse, testified that she saw the driver of the defendant's truck, and that he was rational. She was supported in this by the doctor who was called to treat him as well as the plaintiff. Both said that he was rational. They testified concerning the statements above mentioned to the effect that at one time he said that the collision was occasioned by his sleepiness and another time that it was occasioned by the failure of the plaintiff to have the rear lights of his truck burning. Defendant's driver denied such statements and averred that he was unconscious and remained so for several days. He said he was in the hospital for nine days whereas the record showed in support of the evidence of witnesses that he was in the hospital only three days. The evidence preponderated heavily in favor of the plaintiff and it should be found that defendant's driver had not become unconscious at the time he approached the crossing, as testified by him. This finding is supported by the evidence of Mr. and Mrs. Davis, residing nearby, who heard and saw the collision and the approach of defendant's truck a few seconds prior thereto. Both said that their attention was attracted by "squeals" or "screeching" of the brakes. This would indicate that the defendant's driver had belatedly discovered the truck operated by plaintiff and had unsuccessfully attempted to bring his own truck to a stop before the collision. Upon the facts, it should be found that the defendant's driver either saw or should have seen the truck in front of him and in the exercise of the slightest degree of care could have avoided the collision. Wholly apart from statutory emphasis on standards of duty, the driver of a motor vehicle is obliged under the common law to "keep a vigilant watch ahead for pedestrians and other vehicles, particularly at places where the conditions are such that there are special reasons for anticipating the presence of pedestrians or vehicles, such as street crossings." 42 C. J. Sec. 624, p. 909, 910. Defendant's driver said that he was familiar with the highway at that point and knew of the railroad and that he was approaching the track, where, according to the undisputed testimony, stop-lights or warning lights were flickering and plaintiff's truck with its signal lights burning was standing.

The above mentioned duty was expressed by the District Judge, Southern

District of Florida, in Kelly v. Knabb, D. C. 300 F. 256, as follows:

"I cannot conceive how a driver * * * in the nighttime, in a car equipped as required by law and *using any ordinary care whatever in looking ahead,* could have had a collision such as this one."

In that case the court denied recovery to a plaintiff who drove his motor vehicle into another standing unlighted truck. The court further said that:

"I am of opinion that the negligence of plaintiff's agent is apparent upon the face of the declaration, and that such negligence was the proximate cause of the accident."

Recovery was denied notwithstanding the negligence of the owner of the standing truck in failing to have it lighted as it stood at the curb.

In Fitzgerald v. Norman, 252 S.W. 43, 44, the Supreme Court of Missouri defined the duty of the driver of a motor vehicle with respect to keeping a lookout in front or ahead, as follows:

"It was the duty of the appellant to keep a lookout. There was evidence tending to prove that appellant, in the exercise of ordinary care, could have seen respondent in time to avert injury to him. In such circumstances it is negligence to fail to see."

Many cases may be cited in support of this proposition.

█ It is not contended here that the defendant's driver was free from negligence if he possessed his mental faculties at the time of the collision. As indicated heretofore, the testimony was overwhelming that the defendant's driver was conscious of what he was doing at the time and his statement to the contrary should not be accepted.

It appearing that the defendant is liable to the plaintiff because of the negligence of its driver, the remaining question is to determine what damages should be allowed to the plaintiff.

2. At the outset it must be conceded that the plaintiff suffered substantial as well as very grave injuries in the collision. Both of his legs were broken, the left leg in two places. Several ribs were fractured and he suffered from concussion, together with other bodily injuries. He was rendered unconscious and remained so for several days. He was confined to the hospital at Claremore for approximately five months. He was then removed to his home in Missouri in an ambulance and is still confined to his bed. Several surgical operations have been performed on his limbs. The bone in his left leg, or a considerable portion thereof, has become dead and must be removed. Additional operations will have to be performed.

According to Dr. Frank D. Dixon (a very capable and outstanding orthopedic surgeon of Kansas City, appointed by the court to make an examination of the plaintiff), even a bone graft successfully effected would require many months of treatment and hospitalization to achieve a cure. Dr. Dixon said that bone grafting was successful in 87 to 89 per cent of the cases. Operations heretofore upon the plaintiff's left leg have proved largely ineffective. This leg was broken in two places between the thigh and the knee. Although the right leg, broken below the knee has healed, yet a deformity apparently will permanently remain. In answer to a question propounded by counsel relating to the left leg: "What in your opinion is indicated in the way of treatment, looking toward giving this man a useable left leg?" The doctor answered, "Well, of course, there is a great deal of infection present. There is a large piece of dead bone laying loose there, demarked and apparently practically separated from the rest of the living bone, which would have to be removed. The infection would have to be cleaned up and the extremity put in some form of fixation dressing, such as a properly applied plastic cast. I feel that from the way the distal fracture has healed and the way the subperiosteal calculus is being thrown out around the un-united fracture, there is reasonable expectation that simply cleaning up the infection and aligning the leg and keeping it splinted, which it hasn't been for several months, that there is a definite *possibility* that the fracture might eventually heal. Many unhealed fractures do unite if infection is cleared up. If it did not unite, then unquestionably in order to get a union, it would be necessary at some later date to apply an adequate bone graft." Dr. Dixon further stated that for further treatment to clear up infection now present in plaintiff's left femur hospitalization would be in order "for quite awhile." Concerning the right leg, the doctor said: "There is some bowing at the fracture site which will cause, perhaps, some disturbance of weight bearing later at the knee joint, but it should not constitute a serious inter-

ference with the use of the right leg." Regarding the plaintiff's complaint that he suffered from a defective hearing in his left ear because of injury sustained in the collision, the doctor said: "Well I would hesitate to base an opinion on the degree of loss of hearing * * *. All I could say is that he had adequate hearing, so that whatever loss, it would seem to me not to have been a very incapacitating loss." Concerning the injury to plaintiff's legs, Dr. Dixon said: "The X-Ray of the right lower extremity, with the left taken for comparison, showed a healed comminuted fracture of the upper third of the right tibia, with some outward bowing at the fracture site. The lateral view showed the same fracture with satisfactory alignment in this plane. The X-Ray of the left femur showed there has been a double fracture of the femur, one about five inches above the knee joint, and one about twelve inches above the knee joint. The middle fragment, which resulted from these two fractures was united, in my opinion, to the distal fragment. There was a non-union present at the site of the proximal fracture," that is, "the one nearest to the hip."

Dr. Ray J. Melinder of Claremore, Oklahoma, treated the plaintiff during the five months he was confined in the Franklin Hospital at Claremore. He said that the plaintiff developed a neurosis, which meant that he was mentally sick, and such neurosis was permanent and that the plaintiff's "truck-driving days" were over. He expressed the opinion that the plaintiff suffered from a perforated tympanum in the left ear and that only about 15 to 20 per cent of his hearing remains in that ear. From a base fracture of the skull, however, plaintiff had recovered. He could not express an opinion as to whether or not his knee joints were permanently injured. He also found three fractured ribs at the time plaintiff was hurt in the collision but those have apparently healed.

Dr. Wm. M. Jackson of Maryville, Missouri, treated plaintiff at his home at Wilcox, Missouri. His examination disclosed the breaks in his legs, and he said it required much attention to restore the left leg. He further said that the right leg was knitting but that there were complications. As to his left ear, he said that it was defective from trauma. The plaintiff was suffering from nervous fatigue and weakness, was irritable, and that the future outlook was very grave, with danger of losing his left leg. He found immobility in the left knee from ankylosis, and, as in the case of Dr. Dixon, found dead bone with infection in the left leg. The doctors are united in the opinion that the dead bone "must come out." Dr. Jackson said that there must be bone grafting. He said the infection now present may be cleared up. He stated broadly that the left knee was permanently stiff. This is true also of the right knee.

The plaintiff has been confined in the hospital or in bed since the accident on March 10, 1944, and will be so confined for an indefinite future. It will require a considerable outlay for surgery, medicine and nursing before plaintiff, at best, will be restored, if ever, to reasonable physical activity. The plaintiff was 47 years old in September last. The evidence showed that he had either expended or there had been incurred expenses on account of his injury aggregating approximately $7,000.

Franklin hospital at Claremore had a bill of $1,925.10. Its reasonableness was not questioned. The night nurse at that hospital was entitled to $588 and the day nurse to $36.

There was also a hospital charge at Maryville, Missouri, for $147, with $42 for nursing.

Dr. Melinder indicated that his bill was reasonable at $2,500 to $3,000, with an additional $100 to $150 for assistance rendered by others at his instance.

Dr. Jackson of Maryville, who attended the plaintiff after his return from Claremore, in August 1944, said his bill was reasonable at $350 to $400.

Plaintiff's wife, who was called to Claremore to aid in nursing him, expended $56 in travel and $479 in other expenses with an additional $73 for the use of an ambulance. It was necessary to move the plaintiff from Claremore to his home at Wilcox, Missouri, near Maryville, in an ambulance. Moreover, an ambulance was employed in transferring him from his home in Wilcox to Maryville and thence back to his home.

Roughly, the total expenditure, either paid or incurred, aggregated approximately $7,000. The testimony showed that further major surgery of a highly technical nature will be necessary. This will involve hospitalization and nursing. The expenses for surgery, hospitalization and nursing will be considerable. It is difficult to deter-

mine what this may be. Already $7,000 has been expended or incurred and obviously several thousand dollars will be required in the future. On the whole, the prognosis is favorable for ultimate recovery, although not from the neurosis which has developed, but from the physical incapacity now experienced and suffered by the plaintiff. His suffering has been very great and will necessarily continue to be great. It may be reasonably assumed that surgical and other expenses incident to recovery will increase the presently incurred expenses to $10,000. Such expenses, unlike many similar cases observed in the books, must be met by plaintiff. Compensation for his disabilities and his pain and suffering, both present and future, should be superimposed upon his estimated expenditures.

As was said in Mann v. St. Louis-San Francisco R. Co., Mo.Sup., 72 S.W.2d 977, loc. cit. 983:

"The question of damages in each case must, to a certain extent, depend upon its own circumstances. Courts do, however, make an attempt to have a certain standard of uniformity."

And to a certain extent the adjudicated cases may be used as "guide-posts," for any case under consideration. In the Mann case, supra, the court reduced a judgment to $25,000, holding this to be adequate, where plaintiff, 43 years old, with an earning capacity of $6.64 per day as a railroad switchman, suffered the amputation of one leg and a compound fracture of the other leg. No complications followed his injury. He spent some time in a hospital and "some time at home." Wearing an artificial leg he was able to earn wages at the rate of $4.20 a day after his recovery. The evidence showed that the plaintiff in that case " 'had a very good resistance and there was at no time any evidence of any infection of this fracture. It healed—the fracture and the wound healed by first intention; that is, it healed right up without any evidence of infection and at the time he left the hospital, the leg—the fractured leg was all healed entirely and we just had a protective dressing on the amputation stump, because that had been healed for about ten days before he left the hospital.' " It may be inferred from that case that hospital bills, including surgery, were paid by the defendant and that the suit of the plaintiff was for damages accruing to him.

In Martin v. St. Louis-San Francisco R. Co., 329 Mo. 729, 46 S.W.2d, 149, the Supreme Court of Missouri upheld a verdict for $30,000 in favor of the plaintiff where plaintiff at the time of his injury was 39 years old and in good health. He remained in a hospital from 3½ to 4 months. The union of the bones of the left leg was faulty, necessitating rebreaking and resetting. Two amputations were performed on the arm. The impairment of the ankle, as well as shortening of the left leg was permanent, and the actual loss of earnings up to the time of trial (4½ years after injury) approximated $15,000. It is in like manner inferable that the plaintiff in that case did not incur hospital and surgical expenses.

In McNatt v. Wabash R. Co., 341 Mo. 516, 108 S.W.2d 33, the Supreme Court reduced a verdict to $35,000, where a plaintiff 34 years old and earning "around $240 a month" was in a hospital ten months and whose left leg was injured and was 2½ inches shorter than the right, with other incidents to such injuries. The court said, 341 Mo. 516 loc. cit. 535, 108 S.W.2d 43:

"As we have often stated the subject of excessive verdict is always difficult of just solution. The oft-repeated rule is that appellate courts should not disturb a verdict for damages on the theory that it is excessive, unless it is apparent from the record that the verdict is grossly excessive. * * * Precedents are helpful only by comparison. However, 'when the facts as to the injuries inflicted and losses sustained are similar, though never identical, there should be reasonable uniformity as to the amount of verdicts and judgments in the various cases. * * *' "

In the McNatt case, also, it is inferable that plaintiff was not burdened with medical, surgical and hospital expenses.

In Woods v. St. Louis Merchants' Bridge Terminal R. Co., 8 S.W.2d 922, the Supreme Court upheld a judgment for $30,000 in favor of a 27 year old switchman whose earnings were $200 per month and whose injuries resulted in permanent stiffening of the right arm and amputation of the leg five inches below the knee. Plaintiff in that case was confined in the hospital for weeks at different times and was required daily to visit the hospital during convalescence. He was incapacitated for eight months and permanently incapacitated for steady work.

In Cotton v. Ship-by-Truck Co., 337 Mo. 270, 85 S.W.2d, 80, the Supreme Court of

Missouri ruled that a verdict for $30,000 was excessive by $5,000 where the plaintiff had suffered injuries to his right leg and jaw and had been in the hospital for nine months. Damages were permitted in the sum of $25,000.

In Viermann Bricklaying Co. v. St. Louis Contracting Co., 335 Mo. 534, 73 S. W.2d 734, the Supreme Court reduced a verdict of $30,000 to $18,000, where a man 41 years old suffered serious injuries to the bones and muscles of his right foot, heel and ankle, and leg below the knee joint, and fractures of his thumb and three fingers. His earning capacity before the injury had been $3,200 a year. In that case he had expended more than $3,000 for hospital and nursing expenses. The court allowed a recovery of $18,000.

In the more recent case of Kick v. Franklin et al., 345 Mo. 752, 137 S.W.2d 512, the Supreme Court of Missouri upheld a verdict for $30,000 for a 35 year old stationary engineer. His earnings were 60 cents an hour for ten hours a day, whereas after his injury he earned $15 per week. In that case the plaintiff incurred expenses of $4,200. His injuries, however, were permanent, an arm and a leg each having been shortened. There was an inability to bear his weight on one of his legs and he experienced double vision.

In Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S.W.2d 119, 126, the court approved a verdict for $32,000 and reversed the case and remanded it, with direction to the lower court having granted a new trial to reinstate the verdict. In that case the plaintiff had suffered from a compressed or mashed lumbar vertebra. The plaintiff was only 17 years of age at the time of his injury and was then enjoying good health. The court said:

"The evidence shows he will never be able to follow the occupation of jockey or do any kind of manual labor."

In Busch v. Louisville & Nashville R. Co., 322 Mo. 469, 17 S.W.2d 337, the Supreme Court of Missouri required a remittitur and then affirmed a judgment for $25,000, where a railroad foreman 29 years old, with an earning capacity of $178.59 per month, had lost a leg and parts of the second and third fingers of the left hand and a shortened collar bone. The jury had originally returned a verdict for $81,000. The trial court had reduced the verdict to $36,000; the Supreme Court ordered a further remittitur of $11,000 and affirmed the judgment at $25,000 on condition of the remittitur of $11,000. In that case the plaintiff did not appear to have incurred medical and surgical expenses.

In the very recent case of Darlington v. Railway Exchange Bldg., 183 S.W.2d 101, the Missouri Supreme Court reduced a verdict from $10,000 to $8,000 where the plaintiff suffered an injury to his left shoulder, elbow and wrist, and had lost 25% of motion in both shoulder and forearm. Treatments covered a period of seven months and he had expended $1,000.

Plaintiff has sustained far greater injuries and disabilities than that or those in this case.

See also Kamer v. Missouri Kansas & Texas R. Co. 326 Mo. 792, 32 S.W.2d 1075.

While it is indicated that adjudicated cases can only serve as guideposts, it seems reasonable in this case to find that plaintiff, being 47 years of age, with an earning capacity of approximately $3,000 per year, with an unavoidable loss of labor for several months, if not years, and with an obviously decreased earning capacity, and because of his pain and suffering, ought to be compensated in the sum of at least $20,000, wholly apart from his expenses for treatment, both past and future. These have been computed at $10,000. This should make an aggregate of $30,000. Judgment will be rendered for that amount. Out of the sum so allowed plaintiff the attorneys must necessarily be compensated. Plaintiff sued for $113,350.00.